**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CHANOCH SHREIBER and SCOTT D. LEFKOWITZ, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>SYNACOR, INC., HIMESH BHISE, and WILLIAM J. STUART,<br><br>　　　　　　　　Defendants. | Case No.: 18 Civ. 2979 (LGS)<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## SECOND AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Chanoch Shreiber ("Shreiber" or "Lead Plaintiff") and named plaintiff Scott D. Lefkowitz ("Lefkowitz" and, together with Shreiber, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' second amended class action complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Synacor, Inc. ("Synacor" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Synacor securities between May 5, 2016 and March 15, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, against the Company and two of its senior executives.

2.      Synacor operates as a technology development, multiplatform services, and revenue partner for video, Internet, and communications providers, as well as device manufacturers, governments, and enterprises.  Synacor is headquartered in Buffalo, New York, and its securities trade on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "SYNC."

3.      On May 4, 2016, after the market-closed, Synacor announced that it had secured a three-year portal contract to host web and mobile services for AT&T Inc. ("AT&T").  As set forth herein, during the Class Period, Defendants fraudulently misrepresented to investors that the AT&T contract would generate the same level of revenue for Synacor that AT&T's previous portal provider – Yahoo! – had purportedly earned, "*~$100M per year, after full product deployment in 2017*," despite having no basis for making those representations and, in fact, having contemporaneous knowledge that those statements were false.

4.      Defendants knew that the contract gave AT&T control over development and monetization of the new portal, and that Yahoo!'s platform differed significantly from Synacor's platform, making future performance and success highly unpredictable and uncertain.  In fact, Defendants knew that Synacor was tasked with building a completely new portal which would have no track record of performance or customer receptivity, much less revenue generation, and

would most likely result in reduced customer traffic as customers acquainted themselves with the changes and engineering issues were worked out.

5.     The promise of $100 million in new revenue was a huge development for Synacor given that the Company's annual revenue at the time of the announcement was in the low $100 million range.  Based on this illusory revenue, Defendants announced a "new three-year goal for the company" with annual revenue of $300 million by 2019.  The $100 million never materialized, nor did annual revenue reach anywhere close to $300 million.

6.     Throughout the Class Period, Defendants repeatedly made similar false and misleading statements regarding the value of the AT&T contract and revenue forecasts based on it.  Defendants knew and failed to disclose that there was no reasonable basis for their statements. The statements were based entirely on the AT&T portal's alleged previous year's revenue when hosted by Yahoo!, as opposed to any analysis of the new portal prepared by or on behalf of Synacor at any time.  In fact, at the time Synacor signed the contract with AT&T, the Company was suffering from material weaknesses in its internal controls.  As Defendants revealed in March 2018, Synacor "assigned too few people with the necessary expertise to adequately document, implement and monitor controls" over financial reporting.

7.     Moreover, Defendants disregarded the known risk that AT&T might place a lower priority on monetization of the portal as opposed to engagement of the portal, omitting to inform investors of this material aspect of the contract – that AT&T controlled when and to what extent monetization would occur.  In fact, as detailed herein, confidential witnesses have confirmed that Defendants knew, throughout the Class Period, that AT&T intended to place a lower priority on monetization.  Furthermore, because the $100 million in revenue was a critical element of Synacor's $300 million 2019 target, there was no reasonable basis for that revenue number.

8.      The Company had no reasonable basis for, and should not have given, the revenue estimates based on the AT&T contract.  But as explained herein, the statements were a necessary part of Defendants' plan to inflate the price of Synacor stock, and that is exactly what happened.

9.      Throughout the Class Period, Defendants made materially false and misleading statements and omissions regarding the Company's business.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (a) as of May 2016 there was no reasonable basis for Synacor to assume that revenues from the AT&T contract would approximate the claimed $100 million annual revenues generated under the previous Yahoo! contract (and, in fact, Defendants had contemporaneous knowledge that revenues would be much lower); (b) as of May 2016 there was no reasonable basis for Synacor to assume that it would generate $300 million in annual revenue by 2019 because a critical element of Synacor's $300 million 2019 target was the $100 million in revenue from AT&T; (c) AT&T controlled monetization of the AT&T portal; (d) Defendants' statements about monetization of the portal and revenue forecasts and guidance were part of a knowing plan to inflate Synacor's share price for purposes of the Company's secondary offering; and (e) the Company's internal control over financial reporting was materially deficient, causing the Company to be incapable of producing accurate financial statements.

10.      The truth first began to emerge in August 2017.  During the second quarter 2017 earnings conference call held on August 9, 2017, just four months after the Company's secondary offering, Defendant Himesh Bhise ("Bhise") dropped a bombshell:  "*[A]t this time, the joint AT&T Synacor team has decided to prioritize engagement over monetization and so we now anticipate that much of the ramp up in revenue that we were expecting in the second half of 2017 would get delayed to 2018.  The AT&T and Synacor joint team made the strategic decision to prioritize engagement right now over monetization. . . .  As a result, a significant portion of*

*the revenue that we were expecting in Q3 and Q4 this year is delayed to 2018. . . .  Given the focus on engagement and the delay on full monetization in the AT&T portal to 2018, we are revising our 2017 financial guidance.*"[1]  Defendants made similar statements in an August 9, 2017 post-market press release announcing the Company's financial results for the quarter ended June 30, 2017 and lowering the Company's fiscal 2017 guidance – "*Revenue for the full year of 2017 is projected to be in the range of $140 million to $150 million, adjusted from the previous range of $160 million to $170 million.*"

11.     On this news, Synacor's share price fell $1.15 per share, or 32.39%, to close at $2.40 per share on August 10, 2017.

12.     On March 15, 2018, post-market, Synacor held an earnings conference call with analysts and investors to discuss the Company's fourth-quarter 2017 earnings.  During the call, Defendant Bhise discussed the shortcomings of the AT&T contract, stating that AT&T had chosen to prioritize consumer experience and engagement rather than fully monetize the portal through search and advertising, *admitting that AT&T controlled the monetization decision – it was not a "joint" decision as Defendants had previously told investors*:  "Given this focus in the last three quarters of 2017, we generated approximately $25 million in revenue from AT&T.  *We are expecting that AT&T will continue to focus on consumer experience and as such, our 2018 guidance reflects the annualized 2017 run rate.*  Clearly, this forecast is below the $100 million annual revenue target that AT&T and Synacor announced when we first discussed the portal contract and was a critical element of Synacor's $300 million 2019 target."

13.     During the call, Defendant William J. Stuart ("Stuart") also disclosed material weaknesses in the Company's internal controls over financial reporting.  He stated that the

---

[1]  All emphasis is added unless otherwise noted herein.

Company "**will report in our Form 10-K three material weaknesses in our internal controls over financial reporting.  We believe all three resulted from having initially assigned too few people with the necessary expertise to adequately document, implement and monitor controls.**"

14.     On this news, Synacor's share price fell $0.30 per share, or 14.63%, to close at $1.75 per share on March 16, 2018.

15.     There can be no doubt that the material weaknesses existed when Defendants Bhise and Stuart signed Section 302 Certifications pursuant to The Sarbanes-Oxley Act of 2002 ("SOX") with respect to each quarterly and annual report filed with the SEC during the Class Period.  At all times, they were aware that the Company was understaffed and lacked experienced and knowledgeable personnel in the internal controls area.  Bhise, who joined the Company in 2014, cut 50 jobs in Buffalo to trim costs, an approximately 20% percent staff reduction.  Although the Company hired additional personnel to implement the AT&T contract, it failed to adequately staff its Finance Department.

16.     The material weaknesses should have given Bhise and Stuart pause when it came time to sign each Section 302 Certification.  Nevertheless, they signed each one knowing that internal control over financial reporting was lacking.  Because Synacor's internal controls over financial reporting were inadequate, the Company was incapable of producing accurate financial statements, including appropriate disclosures regarding the known risks and uncertainties associated with the AT&T contract.

17.     Less than five months later, on August 1, 2018, Synacor issued a press release stating that Defendant Stuart was stepping down as CFO.

18.     Additionally, on August 30, 2018, Synacor filed a Form 8-K with the SEC stating that, on August 24, 2018, AT&T delivered notice of non-renewal to Synacor to prevent automatic

renewal of the AT&T contract.  While AT&T has requested that Synacor meet to negotiate potential renewal, as of now, there is no basis to assume that the contract will be renewed.

19.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and the Class have suffered significant damages.

## II.     JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

22.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Synacor's securities trade on the NASDAQ, located within this Judicial District.

23.     In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

### A.     Plaintiffs

24.     Lead Plaintiff Shreiber acquired Synacor securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

25.     Named Plaintiff Lefkowitz acquired Synacor securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

**B.     Defendants**

26.     Synacor is incorporated in Delaware, with its principal executive offices located at 40 La Riviere Drive, Suite 300, Buffalo, New York 14202.

27.     Bhise has served as the Company's Chief Executive Officer ("CEO"), President, and a Board member since August 4, 2014.

28.     Stuart has served as the Company's Chief Financial Officer ("CFO") since September 15, 2011.  Stuart stepped down as CFO in August 2018.

29.     Bhise and Stuart are referred to herein as the "Individual Defendants."  Synacor and the Individual Defendants are collectively referred to as "Defendants."

30.     The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Synacor's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

**IV.     SUBSTANTIVE ALLEGATIONS**

**A.     Synacor's Business**

31.     Synacor operates as a technology development, multiplatform services, and revenue partner for video, internet, and communications providers, as well as device

manufacturers, governments, and enterprises.  Its products include managed portals, advertising solutions, email and collaboration platforms, and cloud-based identity management.

32.     With respect to managed portals, Synacor creates and manages browser home pages and related applications to enable consumer-facing companies to better engage with their customers.  The managed portal service is intended for content delivery companies like cable operators and telephone companies.  The Company manages advertising on the portal and shares advertising revenue with the client.  Synacor also shares the revenue generated by search queries, *i.e.*, Google searches.  In other words, portals are monetized through advertising and search, and Synacor's ultimate goal is to maximize monetization.

33.     Synacor's managed portal and advertising segment generated 59% and 60% of the Company's revenues for 2016 and 2017, respectively.  For 2016, one customer accounted for 16%, or $20.8 million, of Synacor's total revenue.  For 2017, two customers accounted for 28%, or $39.4 million, of the Company's total revenue.  The Company identified AT&T as its largest revenue-generating customer in its 2017 Form 10-K, filed with the SEC on March 16, 2018.

34.     The Company was founded in 1988 and completed its Initial Public Offering ("IPO") in 2012 at $5 per share after unsuccessfully attempting to price the IPO between $10-12 per share.  Since going public, Synacor has lost money year after year.  For the two years prior to the Class Period, Synacor's closing stock price averaged $1.86 per share, never rising above a closing price of $2.70 per share.

**B.      Synacor's Contract with AT&T**

**1.      Synacor Announces a Game-Changing Contract with AT&T**

35.     After market-close on May 4, 2016, Synacor issued a press release entitled "AT&T Awards Synacor Important Portal Services Contract" announcing a partnership with AT&T.  The press release stated in relevant part:

- *Synacor selected to provide portal services for AT&T customers that drive user engagement*

- ***Expected revenues from the contract are ~$100M per year, after full product deployment in 2017***

- *Early products to deploy in Q2 2016, with broader services slated to commence deployment in Q4 2016*

*   *   *

In partnership with AT&T, Synacor will

- Develop and manage innovative desktop and mobile portal services designed to drive user engagement

- Populate these experiences with rich content sourced from popular brands

- ***Monetize these experiences through search and advertising***

36.     The AT&T portal would be monetized through search and advertising, like Synacor's other managed portals, and Synacor would share the revenue with AT&T. For Synacor, the contract would provide badly needed revenue and solidify the Company's shaky financial footing after three years of stagnant revenue and consistent losses.

37.     Prior to the contract with Synacor, AT&T had a 15-year relationship with Yahoo!. The Yahoo! contract, originally signed in 2001, gave Yahoo! the right to host AT&T's website and applications and was estimated to provide Yahoo! with $100 million in annual revenue.

38.     On May 4, 2016, *The Wall Street Journal* published an article entitled "AT&T Unwinds 15-Year Web Alliance With Yahoo; Companies had split ad revenue from AT&T site." The article stated:

> AT&T is unwinding a 15-year partnership with Yahoo Inc. that has spanned the evolution of the Internet. . .

> AT&T said Wednesday that it has awarded the contract to host its Web and mobile portals to Synacor Inc., a company little-known outside of telecom circles.  The deal effectively moves a major chunk of AT&T's business away from Yahoo.

10

"We have agreed to have Synacor manage our next-generation att.net portal, AT&T-branded applications, and search," AT&T said in a statement. Yahoo will continue to host email for AT&T customers, though a person familiar with the deal said that is a fraction of its prior business with the telecom giant.

\*          \*          \*

*Sameet Sinha, an analyst at B. Riley & Co., estimates the AT&T partnership generated about $100 million in annual revenue for Yahoo.*

\*          \*          \*

**Synacor Chief Executive Himesh Bhise said the deal will bring in an additional $100 million a year for the company once it has fully deployed its services for AT&T over the next 12 months.**

39.     The reference to Yahoo!'s loss of "$100 million in annual revenue" was mentioned in a number of articles the next day. For example, on May 5, 2016, *Investor's Business Daily* published an article entitled "Yahoo Stock Up Despite Loss of AT&T Contract; Verizon Near?" The article stated: "Yahoo (YHOO) stock rose early Thursday, despite the loss of an AT&T (T) contract one analyst valued at $100 million in revenue." *Vanity Fair* also published an article on May 5, 2016 entitled "YAHOO JUST LOST A DEAL WORTH $100 MILLION A YEAR." The article stated that the Yahoo! contract "brought in an estimated $100 million annually, nearly all of it profit."

### 2.     Synacor Fraudulently States that the Company Would Generate Revenues Similar to Yahoo!

40.     When Synacor announced after market-close on May 4, 2016 that it won the contract with AT&T, Defendants immediately began making knowingly false and misleading statements that the Company would generate similar, *i.e.*, ~$100 million annually, revenue from the new AT&T contract. Defendants told investors and analysts that Yahoo!'s loss of $100 million in annual revenue was Synacor's gain. This was quite significant given that the Company's overall revenue was in the low $100 million range at the time.

41.     For example, during a conference call on May 5, 2016, Defendant Bhise stated:

*"We estimate the revenues associated with [the AT&T] partnership to be ~$100M per year, after*
*we fully deploy our products and migrate AT&T customers.  This deployment is targeted for*
*2017. . . .  [W]e are announcing today our new three-year goal for the company.  We are calling*
*this our 'Path to 3/30/300': In 3 years (that is 2019), we will generate $30M of EBITDA, on*
*annual revenues of $300M.  This is now our path."*

42.     Defendants' statements regarding revenue from the AT&T contract were false
and/or misleading because Defendants knew, but failed to disclose, that there was no reasonable
basis for the statements.  The statements were based entirely on Yahoo!'s purported prior year
revenue from AT&T, with no in-depth analysis prepared by or on behalf of Synacor or even
analysis specific to the portal Synacor would create.  There was no basis to assume that the Synacor
contract, *which was a materially different contract than the Yahoo! contract*, would generate the
same revenue – $100 million annually – as the Yahoo! contract.  Synacor was not simply taking
over maintenance of an existing portal and improving on it; the contract required Synacor to build
a completely new portal for AT&T.  Synacor's new portal *had no track record of performance or*
*customer receptivity, much less revenue generation*.  Like any new portal or user interface, the
likely result would be less customer traffic at the start as customers acquainted themselves with
the changes and engineering issues were worked out.

43.     Moreover, the Company led investors to believe, again without any basis, that upon
deployment, AT&T would immediately fully monetize the portal well in excess of contractual
minimum payments to reach $100 million in revenue.  Defendants have now revealed that AT&T
had made no such commitment, that Synacor omitted this known material risk and uncertainty,
and that Synacor knowingly did not appropriately adjust its revenue projections for the risk that

AT&T would place a lower priority on monetization versus user engagement. Furthermore, because the $100 million in revenue was a critical element of Synacor's $300 million 2019 target, there was no reasonable basis for that figure either.

44.     Confidential Witness ("CW") 1, an accomplished tech and e-commerce product strategy consultant who served as the Director of Product at Synacor from May 2016, after the contract with AT&T was signed, to September 2016, stated that the Company's public announcements regarding revenue from the AT&T contract were based on the previous year's revenue for the portal when hosted by Yahoo! and assumed that the traffic frequenting the Yahoo! portal would stay with Synacor through the redesign process.

45.     CW1 stated that the Company's revenue announcements were not realistic, and that CW1 tried to inform people of this from the time CW1 arrived at Synacor until the time CW1 left the Company. CW1 stated that Synacor was not simply porting AT&T's current portal. Synacor was making fundamental changes to the portal that could cause users to drop the platform, something that CW1 said must be expected during a project of this magnitude. "Any time you re-platform a website like that, and anyone who works on tech products knows this, [you lose some users]. . . . You must assume that there will be a dip in traffic. . . . You can't assume revenue through the redesign will be the same." *CW1 believes that CW1 was terminated because of CW1's insistence that the revenue numbers were not realistic.*

46.     CW2, an employee with Synacor from February 2000 until August 2018, who served as Vice President of Product & Design from April 2014 until August 2018 and was a key player in the design of the AT&T portal, stated that Defendants Bhise and Stuart were involved in the contract negotiations with AT&T, including "reviewing deal trends and setting high level strategies for the pitch." CW2 stated that the Company "knew attrition would exist, because with

any new product launch you lose a certain percentage of users." CW2 further stated that the blame for the unrealistic revenue projections fell with senior management, including Defendant Bhise. CW2 "heard some pushback on Himesh [Bhise], but he always said it could do better [than the modest projections]."

47.     As Defendants knew, the statements regarding $100 million in annual revenue and "path to 3/30/300" were unsupported by any analysis or current fact, and were nothing more than a pitch to raise the price of Synacor stock for purposes of a secondary offering the following year.

### 3.     Synacor's Shares Soared as a Result of Defendants' False and Misleading Statements and Omissions

48.     News that Synacor won the AT&T contract, which the Company falsely claimed would generate $100 million per year in revenue upon full deployment in 2017 and lead to Company revenues of $300 million per year by 2019, caused the share price to more than double. Investors and analysts were brimming with excitement that this small, little-known company in Buffalo, New York had won a contract with AT&T that had generated enormous amounts of revenue for Yahoo! and which Defendants claimed would do the same for Synacor.

49.     On May 4, 2016, *MarketWatch* reported that "Synacor Inc. shares skyrocketed in the extended session Wednesday after AT&T awarded the video and Internet tech company a portal services contract that could bring in about $100 million a year in revenue beginning in 2017. Synacor shares jumped 130% to $3.25 after hours on heavy volume."

50.     *Buffalo Business First* also reported on May 4, 2016, updated May 5, 2016, that:

Synacor Inc. has scored a major contract from AT&T that will dramatically change the size and scope of the company, nearly doubling its annual revenues to about $217 million by 2017, according to company expectations. The three-year contract means that Synacor will host web and mobile services for the telecommunications giant. It is expected to be worth a total of $300 million in revenue to Synacor. . . .

Synacor . . . has endured lagging share prices, layoffs, the loss of major clients and a challenge by activist investors since it went public in 2012.

14

The company hired a new chief executive officer in the summer of 2014 and has been working to revamp its product offerings with the goal of bringing in more clients.  It has announced several major acquisitions since that time as well.

But the move hadn't excited investors until the AT&T news broke today, sending stock surging upward from $1.41 to $3.22 in a matter of minutes.

51.     On May 5, 2016, *Multichannel News* published an article entitled "Synacor Shares Rocket 158%, Stock has banner day after Synacor AT&T deal."  The article stated:  "Synacor shares closed up 158% to $3.64 each, Thursday, *the day after* the company announced a mobile and Web portal services contract with AT&T that will be worth about $100 million a year when it's fully deployed by sometime in 2017. . . .  Synacor announced a new initiative it's calling '3/30/300,' with a goal of generating $300 million in revenues and $30 million in EBITDA in three years. . . .  Bhise said the plan is to get to $300 million by adding the $100 million coming way of the AT&T deal alongside growth from other [areas]."

### 4.     Defendants Failed to Disclose the Material Fact that AT&T Controlled Monetization of the Portal

52.     While Defendants were quick to announce that the revenue from the AT&T contract would be approximately $100 million per year after full product deployment in 2017 and the Company's "path to 3/30/300," Defendants failed to disclose that AT&T controlled monetization of the portal.

53.     Although Synacor attached the AT&T contract as Exhibits 10.1 and 10.2 to the Company's Form 10-Q for the second quarter of 2017, filed with the SEC on August 15, 2016 (*see* Ex. 1, attached hereto), it is so heavily redacted that the information to be gleaned from it is minimal at best.  Almost all of the terms regarding monetization of the portal were redacted, with the exception of vague terms like "the Parties shall cooperate and work together to increase the revenue derived from the Portal and the Portal Applications."  *Id.* § 8.9(a).  Further, even if the contract had provided for joint control of monetization, which it did not, AT&T effectively

controlled monetization of the portal because of its dominating power as a telecommunications giant.  In fact, according to one of the few readable portions of the contract, AT&T controlled marketing and would be the one to develop the annual marketing plan to drive user engagement and traffic, with input from Synacor.  *See id.* §§  9.1(a) and (d).

54.     According to CW2, it was clear from the start that AT&T wanted to prioritize user experience over advertising, and with those disparate goals, the $100 million per year revenue expectation after full deployment in 2017 was unrealistic:  "AT&T was very fixated on minimizing advertising. …We knew they were concerned with user experience and we had modeled an aggressive approach and a conservative approach."

55.     During the 2017 second quarter earnings conference call held on August 9, 2017, Defendant Bhise portrayed the delayed monetization of the portal as a joint decision between the Company and AT&T – that the joint AT&T Synacor team made the strategic decision to prioritize engagement of the portal over monetization of the portal.  In reality, the companies had conflicting priorities and AT&T was calling the shots.

56.     Seven months later, on March 15, 2018, the last day of the Class Period, Defendant Bhise came clean during a post-market conference call to discuss the Company's fourth quarter 2017 earnings and admitted that "***AT&T has chosen*** . . . to prioritize consumer experience and engagement, and we are collaboratively working with them in achieving that goal."  But clearly this was not the Company's goal.  The Company wanted to fully monetize the portal through advertisement and search as it had promised its stockholders but could not do so because AT&T controlled monetization of the portal.

**5.    Defendants Wanted to Sell Synacor Stock at an Inflated Price in a Secondary Offering**

57.    As stated above, the announcement of Synacor's contract with AT&T was made after the market closed on May 4, 2016.  That day, the closing price was $1.41 per share.  Following the announcement and accompanying false and misleading statements and material omissions, the closing price on May 5, 2016 was $3.64 – an increase of more than 158%.  Synacor continued to mislead stockholders about the AT&T contract and potential revenue throughout the Class Period.

58.    Synacor expected to invest $10 million in the first twelve months of the AT&T contract to develop the new portal.  During the May 10, 2016 first quarter earnings call, Defendants told investors that the Company would "fund the AT&T opportunity fully from the cash that we are generating in operating the business."  This was repeated by Defendant Stuart on the August 3, 2016 second quarter earnings call, "we continue to expect to fund the operating expense investment with cash from operations," and again on the November 14, 2016 third quarter earnings call, "we continue to expect to fund[] operating expense investment with cash from operations."

59.    On November 14, 2016, Synacor filed a shelf registration statement on Form S-3 with the SEC.  According to the Company's November 14, 2016 press release, the registration statement was "intended to provide the company with flexibility to access the capital markets in a timely manner.  Under the shelf registration statement, once declared effective by the SEC, Synacor may from time to time issue common stock up to an aggregate amount of $40 million."  The press release stated that the Company had no current plans to issue securities under the registration statement, but that was not true.  Plaintiffs believe that a loosely planned secondary offering was already in the works.

60.     During the fourth quarter 2016 earnings call on March 15, 2017, Defendant Stuart once again reiterated that the Company "continue[s] to expect to fund the [AT&T portal buildout] with cash from operations."

61.     On April 5, 2017, Synacor's stock closed at $4.15 per share.  After market-close on that day, Synacor issued a press release announcing that it was initiating a secondary public offering of its common stock less than five months after stating that it had no plans to do so and only three weeks after reiterating that it was funding the AT&T portal with "cash from operations." On April 6, 2017, the Company issued a press release announcing the pricing of the offering of 5,715,000 shares of its common stock at $3.50 per share.

62.     On April 11, 2017, Synacor issued another press release announcing that it had completed the secondary offering of its common stock.  Synacor sold 5,715,000 shares and netted approximately $18.5 million, after deducting underwriting discounts, commissions, and expenses. The press release stated that that the funds would be used for "general corporate purposes and working capital."  The underwriters subsequently exercised their over-allotment option, selling an additional 472,846 shares, increasing the secondary offering's total net proceeds to $20 million.

63.     Just 21 days prior to the announcement of the secondary offering, on March 15, 2017, Defendants reiterated their prior false and misleading statements made on May 5, 2016. Namely, during the 2016 fourth quarter earnings conference call held on March 15, 2017, Defendant Stuart stated:  "I'd like to reiterate that our overall financial expectations for our contract with AT&T *remain on track with expected revenue of $100 million per year* after full deployment."  That same day, Synacor issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, in which Defendant Bhise stated that the Company continued to progress

on its "path to 3/30/300."  The press release also provided projected 2017 revenue in the range of $160-$170 million.

64.     But by this time, the Company already knew that monetization of the portal was taking longer to materialize because AT&T was prioritizing consumer experience and engagement over monetization.  Defendants knew this because Synacor conducted monthly and quarterly business reviews with AT&T personnel that specifically addressed revenue projections pursuant to Section 20.1 of the contract, and the Individual Defendants were present at or privy to the information exchanged at those meetings.

65.     Moreover, according to CW3, who served as the Accounts Payable Coordinator in the Finance Department from April 2014 until June 2017, when CW3's position at the Company was eliminated, it was evident early in 2017 that the search and advertising revenue that Synacor had expected to earn through the AT&T portal was taking longer than expected to materialize.  It was no secret at the Company.

66.     Defendants' unsupported revenue forecasts and failure to disclose that AT&T controlled monetization of the portal and prioritized consumer engagement over monetization were intentional and designed to enable Synacor to sell its stock at an inflated price.

### 6.     Four Months After Synacor's Secondary Offering, the Company Lowered its Guidance

67.     A mere four months after the secondary offering, the Company lowered its guidance.  As stated by Kevin M. Rendino, Chairman and CEO of 180° Capital Corporation, a publicly traded closed-end fund, during an August 6, 2018 conference call with its investors – this is a real "no-no in our business as all of you know."

68.     During the 2017 second quarter earnings conference call held on August 9, 2017, Defendant Bhise stated that the "joint" AT&T Synacor team made the strategic decision to

prioritize engagement of the portal over monetization of the portal.  Defendant Stuart stated: "Given the focus on engagement and the delay on full monetization in the AT&T portal to 2018, we are revising our 2017 financial guidance.  For the quarter, we expect $35 million to $40 million. . . .  We expect revenue for the full year 2017 to be in the range of $140 million to $150 million . . ." adjusted from the previous range of $160 million to $170 million.  Defendant Bhise added:  "[W]e remain committed to and we anticipate delivering on our 3/30/300 plan – $300 million of revenue and 30 million of adjusted EBITDA in 2019" even though Defendants knew that the anticipated $100 million in revenue from the AT&T contract that was not materializing would be a critical element of Synacor's target of $300 million in revenue for 2019.

69.     On August 14, 2017, each of the two architects of this fraud – Defendants Bhise and Stuart – bought 10,000 shares of Synacor.  Defendant Bhise purchased 10,000 shares at $2.45 per share, or $24,500, and Defendant Stuart purchased 10,000 shares at $2.50 per share, or $25,000.  These purchases were part of their attempt to maintain the facade that they still believed in the forecast and 3/30/300 guidance that they affirmed during the August 9, 2017 conference call and in an August 9, 2017 press release.  Losing a few thousand dollars each was a small price to pay for a show of a faith, particularly when Defendants Bhise and Stuart's total compensation for the fiscal year ended 2017 was $981,786 and $404,823, respectively.  They did not purchase any additional Synacor shares during the Class Period or thereafter.

70.     Defendants waited until March 15, 2018 to come clean.  On March 15, 2018, post-market, Synacor held a conference call with analysts and investors.  During the call, Defendant Bhise discussed the failure to achieve the touted revenue from the AT&T contract, **stating that AT&T alone, as opposed to the joint AT&T Synacor team**, had chosen to prioritize consumer experience and engagement of the portal over monetization.  "Given this focus in the last three

quarters of 2017, we generated approximately $25 million in revenue from AT&T.  We are expecting that AT&T will continue to focus on consumer experience and as such, our 2018 guidance reflects the annualized 2017 run rate.  Clearly this forecast is below the $100 million annual revenue target that AT&T and Synacor announced . . . and was a critical element of Synacor's $300 million 2019 target."

71.     The repeatedly touted $100 million in annual revenue from the AT&T contract had been cut by more than half because Defendants knew they had no reasonable basis to expect $100 million of annual revenue in the first place.  AT&T controlled monetization of the portal and AT&T's focus, from the start, was user engagement and user experience – not generating immediate revenue with advertisements.  And because the $100 million was a critical element of Synacor's $300 million revenue forecast for 2019, that forecast was finally scrapped as well.

### 7.     The Anticipated AT&T Contract Revenue Never Materialized and AT&T Issued a Notice of Non-Renewal to Prevent Automatic Renewal

72.     To date, the expected revenue from the AT&T contract has not materialized, and Synacor management has lost all credibility.  AT&T appropriately chose to focus on customer experience and engagement rather than monetizing the portal through search and advertising. Stockholders have now come to realize that Defendants misled them.

73.     On August 30, 2018, Synacor filed a Form 8-K with the SEC stating that on August 24, 2018, AT&T delivered notice of non-renewal to Synacor to prevent automatic renewal of the contract.  While the Form 8-K states that AT&T has requested that Synacor meet to negotiate renewal, as of now, stockholders have no basis to assume that the contract will be renewed.

### C.     Synacor's Internal Controls Over Financial Reporting Were Inadequate

74.     Following the passage of SOX, any quarterly or annual report filed by a public company with the SEC must include the personal certification of the CEO and CFO under SOX

Section 302.  The CEO and CFO must certify:  (1) that they are directly responsible for the accuracy, documentation, and submission of all financial reports, as well as the internal controls structure of the registrant; (2) that they have established and maintained adequate internal controls for public disclosure; (3) that the financial statements are accurate, comply with the requirements of the Exchange Act, and that the information is fairly presented; and (4) that they have disclosed any fraud and all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting to the registrant's auditors.

75.    One of the purposes of Section 302 is to ensure that a public company's CEO and CFO take a proactive role in the company's public disclosures.  Another purpose of Section 302 is to give investors more confidence that a company's periodic reports are accurate and reliable.

76.    In each of the annual and quarterly reports filed during the Class Period, Defendants Bhise and Stuart executed Section 302 Certifications.

77.    During the fourth quarter 2017 earnings conference call held on March 15, 2018, Defendant Stuart disclosed material weaknesses in the Company's internal control over financial reporting.  He stated:

> As 2017 was our fifth full year as a public company, we were required for the first time to obtain an independent audit of our internal controls over financial reporting under Section 404 of Sarbanes-Oxley as of December 31, 2017.  *As a result of this audit, we will report in our Form 10-K three material weaknesses in our internal controls over financial reporting.  We believe all three resulted from having initially assigned too few people with the necessary expertise to adequately document, implement and monitor controls.*

78.    Deloitte & Touche LLP's ("D&T") March 16, 2018 Report on Synacor's Financial Statements "expressed an adverse opinion on the Company's internal control over financial reporting because of material weaknesses."  D&T's Opinion on Internal Control over Financial Reporting stated that *the Company has not maintained effective internal control over financial reporting as of December 31, 2017.*  It also stated:

**Material Weaknesses**

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. ***The following material weaknesses have been identified and included in management's assessment: (i) ineffective control environment due to a lack of sufficient qualified personnel with an appropriate level of knowledge and experience with generally accepted accounting principles, (ii) ineffective control activities due to the lack of timeliness in executing business process controls, and (iii) ineffective monitoring controls to ascertain whether the components of internal control were present and functioning.***

79.     There can be no doubt that the three material weaknesses identified above existed when Defendants Bhise and Stuart executed each SOX 302 Certification.

80.     At all times, Defendants were aware that the Company was understaffed, particularly lacking experienced and knowledgeable personnel in the internal controls area.  Bhise, who joined the Company in 2014, personally cut 50 jobs in Buffalo to trim costs, which was roughly a 20% percent staff reduction.  *See* David Robinson, "Synacor lands $100 million annual contract from AT&T," *The Buffalo News*, May 5, 2016.  Although the Company hired additional personnel for purposes of the AT&T contract, it failed to adequately staff the Finance Department.

81.     According to CW3 who, as noted above, served as the Accounts Payable Coordinator in the Finance Department from April 2014 to June 2017, "[t]urnover was terrible." By the time CW3 left the Company, CW3 had had four different managers and "was the longest standing person in the [Finance] Department."  Many of CW3's colleagues had defected in the year prior to CW3's departure.  CW3 stated that accounting personnel were viewed as second-class citizens at the Company and not treated particularly well.  Additionally, CW3 believed that Defendant Stuart, the CFO, "should have retired" as "he had no idea what was going on, and financial oversight was poor."

82.     The material weaknesses described above should have given Defendants Bhise and Stuart pause when it came time to sign each SOX certification.  Nevertheless, they signed each one knowing that internal control over financial reporting was lacking.

83.     Because Synacor's internal controls over financial reporting were inadequate as described above, the Company was incapable of producing accurate financial statements.

84.     Specifically, Item 303 of Regulation S-K requires the disclosure of "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii); *see also SEC Interpretation: Management's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 6835.

85.     The disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future."  *See SEC Interpretation: Management's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 6835.  Thus, information "regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects" and "[c]ompanies should provide quantitative as well as qualitative disclosure when quantitative information is reasonably available and will provide material information for investors."  *See SEC Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 8350.

86.     Pursuant to Item 303, disclosure of known trends and uncertainties is required "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation." *See SEC Interpretation: Management's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 6835.

87.     While Defendants disclosed that "if revenue from the AT&T relationship were to decline due to competitive or other reasons, our results of operations and financial position would be adversely affected," they pointedly omitted the known uncertainty regarding revenue from the AT&T relationship – that AT&T controlled monetization.

88.     Less than five months after disclosing these material weaknesses, Synacor issued a press release on August 1, 2018, attached as Exhibit 99.2 to a Form 8-K filed with the SEC, stating that Defendant Stuart was stepping down as CFO, and that Tim Heasley, who joined Synacor as senior vice president of finance in May 2018, would be replacing Stuart as CFO effective immediately.

## V.     MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A.     False and/or Misleading Statements During the Second Quarter of 2016 (April 1, 2016 to June 30, 2016)

89.     On May 4, 2016 post market-close, Synacor issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, entitled "AT&T Awards Synacor Important Portal Services Contract," announcing a partnership with AT&T.  The press release stated in relevant part:

- *Synacor selected to provide portal services for AT&T customers that drive user engagement*

- ***Expected revenues from the contract are ~$100M per year, after full product deployment in 2017***

25

- *Early products to deploy in Q2 2016, with broader services slated to commence deployment in Q4 2016*

*     *     *

In partnership with AT&T, Synacor will

- Develop and manage innovative desktop and mobile portal services designed to drive user engagement

- Populate these experiences with rich content sourced from popular brands

- *Monetize these experiences through search and advertising*

90.     That same day, *The Wall Street Journal* published an article entitled "AT&T

Unwinds 15-Year Web Alliance With Yahoo; Companies had split ad revenue from AT&T site."

The article stated:

> AT&T is unwinding a 15-year partnership with Yahoo Inc. that has spanned the evolution of the Internet. . . .

> AT&T said Wednesday that it has awarded the contract to host its Web and mobile portals to Synacor Inc., a company little-known outside of telecom circles.  The deal effectively moves a major chunk of AT&T's business away from Yahoo.

> "We have agreed to have Synacor manage our next-generation att.net portal, AT&T-branded applications, and search," AT&T said in a statement.  Yahoo will continue to host email for AT&T customers, though a person familiar with the deal said that is a fraction of its prior business with the telecom giant.

*     *     *

> Sameet Sinha, an analyst at B. Riley & Co., estimates the AT&T partnership generated about $100 million in annual revenue for Yahoo.

*     *     *

> ***Synacor Chief Executive Himesh Bhise said the deal will bring in an additional $100 million a year for the company once it has fully deployed its services for AT&T over the next 12 months.***

91.     On May 5, 2016, Synacor held a conference call for investors during which

Defendant Bhise stated:  ***"We estimate the revenues associated with [the AT&T] partnership to***

***be ~ $100M per year, after we fully deploy our products and migrate AT&T customers.  This***

26

***deployment is targeted for 2017. . . .   [W]e are announcing today our new three-year goal for the company.  We are calling this our 'Path to 3/30/300': In 3 years (that is 2019), we will generate $30M of EBITDA, on annual revenues of $300M.  This is now our path."***

92.     There was also a written presentation for the May 5, 2016 conference call that was posted on the Company's website entitled "AT&T SELECTS SYNACOR TO ENABLE PORTAL SERVICES[,] MAY 5, 2016."  Page 8 of the presentation states that the AT&T contract has a current "***Value of ~ $100M per year upon full deployment.***"

93.     As expected, investors reacted favorably to this news and Synacor's stock price more than doubled overnight, closing at $1.41 on May 4, 2016 and at $3.64 on May 5, 2016, on unusually high trading volume of 25,592,700 shares.

94.     On May 10, 2016, Synacor issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC on May 11, 2016, entitled "Synacor Beats Q1 2016 Guidance, Grows Margins, Wins AT&T Contract, ***Sets $300 Million Revenue Target***," discussing in detail the AT&T contract and stating in relevant part:

> "We begin 2016 with another successful quarter for Synacor – delivering significant year-over-year growth, expanding margins, and achieving several important milestones," said Synacor CEO Himesh Bhise.  "We are honored to have been selected from among the many contenders to provide AT&T with portal services.  In addition, we continue to make strong progress in adding and renewing customers to our portal, advertising, email, and video platforms."

> "In less than two years, Synacor has undergone a massive transformation that has positioned us to compete effectively in several high-growth digital markets.  Today, we have an enviable global customer base, a compelling and broad portfolio of products, and an advertising platform at scale.  Our new contract win with AT&T is not only validation of our transformation, but is also an indicator and accelerator of our future growth and underpins our confidence to achieve ***our new long-term financial target of $300 million in revenue and $30 million in adjusted EBITDA in 2019***," Bhise continued.

*Recent Highlights*

- Signed a multi-year portal services agreement with AT&T, which is *expected to reach approximately $100 million of annual revenues after full product deployment is achieved in 2017*

- *Introduced a new "Path to 3/30/300" financial plan targeting annual revenue of $300 million and adjusted EBITDA of $30 million in 2019*

95.     During the 2016 first quarter earnings conference call held on May 10, 2016,

Defendant Bhise stated:

> [W]e announced our partnership with AT&T, and *we shared our financial targets of $300 million in revenue, $30 million in EBITDA in 2019.*
>
> *         *         *
>
> To recap, in partnership with AT&T, we will be developing and managing innovative desktop and mobile portal services designed to drive user engagement. We will populate these portal experiences with rich content sourced from popular brands and will monetize this content through search and advertising. *We estimate the value of this multi-year contract to be approximately $100 million per year after we fully deploy our products to AT&T customers. This deployment is targeted over 2017.*
>
> *         *         *
>
> *We are targeting annual revenue of $300 million and adjusted EBITDA of $30 million in three years, that is in 2019.* This represents revenue growth of 30% per year.
>
> *The $300 million revenue target contemplates our base business expectations for 2016, the value we expect from AT&T*, our prospects in the high growth markets of email, advertising video and identity management where Synacor has strong market positions, and incremental opportunities in international enterprise price markets. The $30 million EBITDA target contemplates benefits of scale, costs and monetization, in our portal and advertising business as we add traffic, higher margins from our recurring and fee-based businesses in email and video.

96.     On May 16, 2016, Synacor filed its quarterly report on Form 10-Q with the SEC,

announcing the Company's financial and operating results for the quarter ended March 31, 2016

(the "1Q 2016 10-Q"). For the quarter, Synacor reported a net loss of $1.57 million, or $0.05 per

diluted share, on revenue of $30.26 million, compared to a net loss of $1.07 million, or $0.04 per

diluted share, on revenue of $26.73 million for the same period in the prior year.

97.     In the 1Q 2016 10-Q, the Company stated in relevant part:

On May 4, 2016, the Company announced it had entered into a three-year agreement with AT&T Services, Inc. (or "AT&T") to provide Managed Portals and Advertising solutions for use by AT&T's consumers.  The Company expects that certain products will be deployed under this contract in the second quarter of 2016, with full deployment expected in early 2017.  ***The Company expects that revenue attributable to AT&T will account for a substantial portion of its revenue beginning in 2017***.

98.     The 1Q 2016 10-Q contained certifications pursuant to Section 302 of SOX, signed

by the Individual Defendants, that stated:

1.  I have reviewed this Quarterly Report on Form 10-Q [or this Annual Report on Form 10-K] of Synacor, Inc.;

2.  ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3.  ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  ***The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions)***:

a.  ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

b.  ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

99.  The statements made by Defendants in ¶¶ 89-98 were materially false and/or misleading and/or failed to disclose that: (a) as of May 2016 there was no reasonable basis for Synacor to assume that revenues from the AT&T contract would approximate the claimed $100 million annual revenues generated under the previous Yahoo! contract (and, in fact, Defendants had contemporaneous knowledge that revenues would be much lower); (b) as of May 2016 there was no reasonable basis for Synacor to assume that it would generate $300 million in annual revenue by 2019 because a critical element of Synacor's $300 million 2019 target was the $100 million in revenue from AT&T; (c) AT&T controlled monetization of the AT&T portal; (d) Defendants' statements about monetization of the portal and revenue forecasts and guidance were part of a knowing plan to inflate Synacor's share price for purposes of the Company's secondary

offering; and (e) the Company's internal control over financial reporting was materially deficient, causing the Company to be incapable of producing accurate financial statements.

100.     To the extent that any of the statements in ¶¶ 89-98 were identified as forward-looking, the statement was not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.

**B.      False and/or Misleading Statements During the Third Quarter of 2016 (July 1, 2016 to September 30, 2016)**

101.     On August 3, 2016, Synacor issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, entitled "Synacor Delivers 23% Revenue Growth, Advances on Path to '3/30/300,'" announcing the Company's financial results for the quarter ended June 30, 2016. The press release stated in relevant part:

> "We delivered another strong quarter for Synacor with significant year-over-year revenue growth and adjusted EBITDA that exceeded our previously announced guidance," said Synacor CEO Himesh Bhise. ***"We are pleased with our progress in preparing to support our AT&T business and are advancing in line with our plans for deployment over 2017."***
>
> "We remain confident in the foundation that we have laid for future growth. ***Our continued trajectory toward $300 million in revenue in three years is reflected in the demonstrated progress we are making against our 2016 strategic objectives***," Bhise concluded.

102.     During the 2016 second quarter earnings conference call on August 3, 2016, Defendant Bhise stated: "***We are advancing in-line with our plans for AT&T deployment through 2017 with expected revenue of $100 million per year after full deployment. . . . We're targeting annual revenue of $300 million with adjusted EBITDA of $30 million in three years that is in 2019.***"

103.     On August 15, 2016, Synacor filed its quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the

"2Q 2016 10-Q").  For the quarter, Synacor reported a net loss of $2.76 million, or $0.09 per diluted share, on revenue of $30.48 million, compared to a net loss of $1.08 million, or $0.04 per diluted share, on revenue of $24.72 million for the same period in the prior year.

104.    In the 2Q 2016 10-Q, the Company stated in relevant part:

> ***We anticipate that search activity and search revenue will increase in the future due to our three-year portal services contract with AT&T Services, Inc., or AT&T, to provide Managed Portals and Advertising solutions for use by AT&T's customers***.  We and AT&T entered into the portal services contract in May 2016 and we expect to complete deploying our solutions in the first half of 2017.  In addition, we expect a future increase of search activity on smartphones and tablets as we believe our continuing investment in our next-generation Managed Portals and Advertising experiences will allow us to compete more effectively for search activity on smartphones and tablets.

105.    The 2Q 2016 10-Q contained certifications pursuant to Section 302 of SOX signed by the Individual Defendants.  The statements therein were the same statements as set forth in ¶ 98 herein.

106.    The statements made by Defendants in ¶¶ 101-105 were false and/or misleading and/or failed to disclose that: (a) there was no reasonable basis for Synacor to assume that revenues from the AT&T contract would approximate the claimed $100 million annual revenues generated under the previous Yahoo! contract (and, in fact, Defendants had contemporaneous knowledge that revenues would be much lower); (b) there was no reasonable basis for Synacor to assume that it would generate $300 million in annual revenue by 2019 because a critical element of Synacor's $300 million 2019 target was the $100 million in revenue from AT&T; (c) AT&T controlled monetization of the AT&T portal; (d) Defendants' statements about monetization of the portal and revenue forecasts and guidance were part of a knowing plan to inflate Synacor's share price for purposes of the Company's secondary offering; (e) the Company's internal control over financial reporting was materially deficient, causing the Company to be incapable of producing accurate financial statements.

107.    To the extent that any of the statements in ¶¶ 101-105 were identified as forward-looking, the statement was not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.

**C.    False and/or Misleading Statements During the Fourth Quarter of 2016 (October 1, 2016 to December 31, 2016)**

108.    On November 14, 2016, Synacor issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, entitled "Synacor Exceeds Guidance, Delivers 20% Revenue Growth in Third Quarter 2016 *as Path to '3/30/300' Remains on Track*" announcing the Company's financial results for the quarter ended September 30, 2016.  The press release stated in relevant part:

> "We delivered another solid quarter, exceeding our guidance and achieving double-digit top-line growth, margin expansion and growth in recurring and fee-based revenue," said Synacor CEO Himesh Bhise.  "We are making great strides in advancing our technology and products, in particular this quarter, with our AT&T partnership, Zimbra Open Source and Cloud ID offerings.

> "We remain well positioned in the growing digital markets that we serve and *are on track to deliver on our target of $300 million in revenue and $30 million in adjusted EBITDA in 2019*," said Bhise.

109.    During the 2016 third quarter earnings conference call held the same day, Defendant Bhise stated:

> We continue to make excellent progress with our AT&T partnership.  The joint AT&T and Synacor team has been working hard on building the new AT&T multiplatform portal populated with rich content, enabled with user-driven functionality, and monetized through search and advertising.  The joint team has also been crafting the launch and deployment plan.

> We are planning the launch of the AT&T desktop and mobile web portal in the first half of 2017 and deployment will ramp and be completed through 2017 as previously discussed.  Our initial estimate at contract signing was a limited Q4 2016 release given the size and expanded scope of this project and after our recent joint planning we've pushed back the official launch date.

*Revenue contribution from AT&T will begin in 2017* and we are adjusting our financial guidance for Q4 2016 accordingly.  *Our overall financial expectations for our contract with AT&T remained very much on track with expected full-year revenue of $100 million after deployment is complete.*

110.   When questioned about the delay of the official launch date from Q4 2016 until 2017, Defendant Bhise responded:

It's helpful to reiterate kind of at the very beginning, first of all, we're making great progress, right?  This is a big team, we've hired up a lot of people, AT&T has put a good team on it and together the teams are working very well together.  As this team kind of got into the actual deployment kind of development planning and deployment planning of this large project and as we kind of expand its scope along the way, we started making some calls about when the appropriate launch timing might be.

So, at contract signing which is when we put this initial Q4 number out there, this was before kind of this detailed planning had started, we told we might be able to do a limited release in Q4, we might be able to earn some revenue.  But quite frankly, as the team started scoping out the actual features, scoping out deployment schedule, [ph] the expansion into scope (21:46), we decided instead jointly to focus on the first half of the 2017.

And as you can see from our guidance, we're still managing to EBITDA profitability, even though it might impact our Q4 revenues.  *And I think the real prize here is ultimately launching a good product and getting to the $100 million run rate by the end of 2017, so that we can be on track to achieve our 3/30/300 plan, right?*

In terms of your specific questions about date, this is a pretty multifaceted launch. It involves a desktop portal, it involves a mobile web portal, it involves native apps for iOS and Android, so there are several things that are going to factor into a date per se.  As I mentioned in the call, the Android app is already out, right?  I mean, we're still adding features and functionality to it every couple of weeks, but it's out. It's gotten – hundreds of thousands of users have downloaded it, they've all given it great ratings.

And so in that spirit, we kind of expect the mobile web and the portal launch with kind of all of these additional features to be some time in the first half.  We're not going to be more specific right now, because it requires deployment and migration planning, but we're going to be out in the first half.  We'll be ramping it up, we'll be ramping migration up, we'll be ramping revenue up.  *And so, I don't think it should really impact what one might be expecting of our revenues from AT&T in 2017 per se, because we're still focused on ramping up and getting to the run rate of $100 million by the end of the year.*

111.    On November 14, 2016, Synacor filed its quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "3Q 2016 10-Q").  For the quarter, Synacor reported a net loss of $3.37 million, or $0.11 per diluted share, on revenue of $31.72 million, compared to a net loss of $930,000, or $0.03 per diluted share, on revenue of $26.35 million for the same period in the prior year.

112.    In the 3Q 2016 10-Q, the Company stated in relevant part:

> ***We anticipate that search activity and search revenue will increase in the future due to our three-year portal services contract with AT&T Services, Inc., or AT&T, to provide Managed Portals and Advertising solutions for use by AT&T's customers.***  We and AT&T entered into the portal services contract in May 2016 and we expect to complete deploying our solutions in the second half of 2017.  In addition, we expect a future increase of search activity on smartphones and tablets as we believe our continuing investment in our next-generation Managed Portals and Advertising experiences will allow us to compete more effectively for search activity on smartphones and tablets.

113.    The 3Q 2016 10-Q contained certifications pursuant to Section 302 of SOX signed by the Individual Defendants.  The statements therein were the same statements as set forth in ¶ 98 herein.

114.    On November 14, 2016, Synacor also filed a shelf registration statement on Form S-3 with the SEC.  According to the Company's November 14, 2016 press release, the registration statement was "intended to provide the company with flexibility to access the capital markets in a timely manner.  Under the shelf registration statement, once declared effective by the SEC, Synacor may from time to time issue common stock up to an aggregate amount of $40 million." The press release stated that ***"[t]he [C]ompany ha[d] no current plans to issue securities under the registration statement."***  Defendant Bhise reiterated this on the 2016 third quarter earnings call, stating: "This registration statement is intended to provide us with flexibility to access the capital markets in a timely manner.  ***As one can surmise from our current financial performance, we do not have any present plans to issue securities under this registration statement***."

115.    Following this 2016 third quarter earnings report, Ladenburg Thalmann commented:

> While we expect investors to express some disappointment by the delay of revenue from AT&T we view this as a temporary setback.  Initiating on a contract of this magnitude is likely to occur in an irregular fashion.  ***That said assuming the company is more or less on schedule, the value creation from the contract is unchanged by revenue shifting from one quarter to another.***  For progress on the deal we think investors should look to the mobile app.

116.    On November 15, 2016, Rosenblatt Securities ("Rosenblatt") also issued a report on Synacor.  In discussing the Company's registration statement filing, Rosenblatt stated:

> This can be unsettling news to investors***, but we believe the company when they say they can fund the AT&T from cash flow as they have done this year, but we do believe that they will have opportunities in the future to accelerate growth, and having this will allow them to move more quickly against big opportunities.***  Only time will tell how they choose to use this tool.

117.    The statements made by Defendants in ¶¶ 108-114 were false and/or misleading and/or failed to disclose that: (a) there was no reasonable basis for Synacor to assume that revenues from the AT&T contract would approximate the claimed $100 million annual revenues generated under the previous Yahoo! contract (and, in fact, Defendants had contemporaneous knowledge that revenues would be much lower); (b) there was no reasonable basis for Synacor to assume that it would generate $300 million in annual revenue by 2019 because a critical element of Synacor's $300 million 2019 target was the $100 million in revenue from AT&T; (c) AT&T controlled monetization of the AT&T portal; (d) Defendants' statements about monetization of the portal and revenue forecasts and guidance were part of a knowing plan to inflate Synacor's share price for purposes of the Company's secondary offering; (e) by November 2016, the Company already had loose plans for a secondary offering that occurred five months later; and (f) the Company's internal control over financial reporting was materially deficient, causing the Company to be incapable of producing accurate financial statements.

118.     To the extent that any of the statements in ¶¶ 108-114 were identified as forward-looking, the statement was not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.

### D.     False and/or Misleading Statements During the First Quarter of 2017 (January 1, 2017-March 31, 2017)

119.     On March 15, 2017, Synacor issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, entitled "Synacor Reports 16% Revenue Growth for 2016 and Announces Guidance of About 30% Growth for 2017," announcing the Company's financial results for the quarter and year ended December 31, 2016.  The press release stated in relevant part:

> "We are seeing strong market validation of Synacor's portal, email, advertising and video products," said Synacor CEO Himesh Bhise.  "*We continue to make excellent progress toward the launch and deployment of the AT&T portal*, and we announced several new customer wins in email and video.
>
> "We begin 2017 a stronger Synacor, well positioned in attractive and growing digital markets.  *We expect accelerated revenue growth of about 30% this year, as we continue to progress on our Path to 3/30/300*."
>
> Recent Highlights
>
> - Made excellent progress on plan to launch the new AT&T desktop and mobile web portal in the first half of 2017, and deployment will be completed through 2017.
>
> *             *             *
>
> **Guidance**
>
> Based on information available as of March 15, 2017, Synacor is providing financial guidance for fiscal 2017 and the first quarter of fiscal 2017 as follows:
>
> - *Fiscal 2017 Guidance*: *Revenue for the full year of 2017 is projected to grow 26% to 33% to be in the range of $160.0 million to $170.0 million.*  Synacor expects to report a net loss in the range of $2.8 million to $8.0 million and adjusted EBITDA in the range of $6.0 million to $10.0 million,

which excludes stock-based compensation expense of $2.8 million to $3.2 million, depreciation and amortization of $8.8 million to $9.6 million, and tax, interest expense and other income and expense of $1.2 million.

- **Q1 2017 Guidance**: Revenue for the first quarter of 2017 is projected to be in the range of $26.0 million to $28.0 million.  Synacor expects to report a net loss of $6.2 million to $7.5 million and adjusted EBITDA of $(3.0) million to $(4.0) million, which excludes stock-based compensation expense of $0.7 million to $0.8 million, depreciation and amortization of $2.2 million to $2.4 million and tax, interest expense and other income and expense of $0.3 million.

Net Income and adjusted EBITDA guidance for the first quarter and fiscal year 2017 reflect a portion of the $10 million investment planned from the second quarter of 2016 through the first quarter of 2017 to deploy portal services for AT&T.

120.     During the 2016 fourth quarter earnings conference call held on March 15, 2017, a few months shy of the one-year anniversary of the signing of the AT&T contract, Defendant Stuart stated:  ***"I'd like to reiterate that our overall financial expectations for our contract with AT&T remain on track with expected revenue of $100 million per year after full deployment."***

121.     During that same earnings conference call, Defendant Bhise also stated that all was well: "***We continue to make excellent progress with the ATT.net transition . . .  Synacor is now poised to deliver accelerated revenue growth in 2017 and beyond. . . .  We remain on track to launch the new AT&T desktop and mobile web portal in the first half of this year and deployment will be completed through 2017***."

122.     When asked by an analyst if he could provide more granularity as to how the Company gets to $300 million in revenue in 2019, Bhise replied:  ***"[W]ith the 30% growth rate next year we're looking at roughly 30% to 35% annual growth rate in the following two years to get to our $300 million revenue target. . . .  [S]tarting in 2018, we'll see the full benefit of the AT&T portal revenue***.  And as you know, we're only going to see a piece of that in 2017 and that's exciting."

123.    Ladenburg Thalmann responded to this positive earnings report, stating:

**Most significant for the quarter is the company's confidence in the rollout of AT&T.**  Though the legacy business is performing well for SYNC the impact of AT&T dwarfs the other growth opportunities in the short run.

124.    On March 22, 2017, Synacor filed its annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 10-K").  For fiscal year 2016, Synacor reported a net loss of $10.74 million, or $0.36 per diluted share, on revenue of $127.37 million, compared to a net loss of $3.47 million, or $0.12 per diluted share, on revenue of $110.25 million for fiscal year 2015.

125.    The 2016 10-K contained certifications pursuant to Section 302 of SOX signed by the Individual Defendants.  The statements therein were the same statements as set forth in ¶ 98 herein.

126.    The statements made by Defendants in ¶¶ 119-122 and ¶¶ 124-125 were false and/or misleading and/or failed to disclose that: (a) there was no reasonable basis for Synacor to assume that revenues from the AT&T contract would approximate the claimed $100 million annual revenues generated under the previous Yahoo! contract (and, in fact, Defendants had contemporaneous knowledge that revenues would be much lower); (b) there was no reasonable basis for Synacor to assume that it would generate $300 million in annual revenue by 2019 because a critical element of Synacor's $300 million 2019 target was the $100 million in revenue from AT&T; (c) AT&T controlled monetization of the AT&T portal; (d) Defendants' statements about monetization of the portal and revenue forecasts and guidance were part of a knowing plan to inflate Synacor's share price for purposes of the Company's secondary offering; (e) Defendant Bhise had no idea when the Company would see the full benefit of the AT&T portal, if ever; and (f) the Company's internal control over financial reporting was materially deficient, causing the Company to be incapable of producing accurate financial statements.

127.    To the extent that any of the statements in ¶¶ 119-122 and ¶¶124-125 were identified as forward-looking, the statement was not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.

**E.    False and/or Misleading Statements During the Second Quarter of 2017 (April 1, 2017 to June 30, 2017)**

128.    On May 10, 2017, Synacor issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, entitled "Synacor Delivers on First-Quarter 2017 Financial Guidance; Achieves Milestones on Path to 3/30/300," announcing the Company's financial results for the first quarter ended March 31, 2017.  The press release stated in relevant part:

> "We continue to see strong customer affirmation of Synacor platforms, as we renew and expand key current relationships and win new customers.  And I'm pleased to announce that the new ATT.net portal is live and the phased rollout is well underway," said Synacor CEO Himesh Bhise.
>
> "In April, we strengthened our balance sheet with $20 million in capital from an equity offering in order to execute on our strong growth pipeline.  ***We remain well positioned to deliver on our target of $300 million in revenue and $30 million in adjusted EBITDA in 2019," said Bhise***.
>
> *              *              *
>
> Based on information available as of May 10, 2017, the Company is providing financial guidance for the second quarter and fiscal 2017 as follows:
>
> - ***Q2 2017 Guidance:*** Revenue for the second quarter of 2017 is projected to be in the range of $28.0 million to $30.0 million.  The Company expects to report a net loss of $3.2 million to $5.0 million and adjusted EBITDA of ($1.5) million to $0.0 million, which excludes stock-based compensation expense of $0.7 million to $0.8 million, depreciation and amortization expense of $2.2 million to $2.4 million and tax, interest expense and other income and expense of approximately $0.3 million.
>
> - ***Fiscal 2017 Guidance***: ***As announced earlier, revenue for the full year of 2017 is projected to be in the range of $160.0 million to $170.0 million***. The Company expects to report a net loss in the range of $2.8 million to $8.0 million and adjusted EBITDA in the range of $6.0 million to $10.0 million, which excludes stock-based compensation expense of $2.8 million

to $3.2 million, depreciation and amortization expense of $8.8 million to $9.6 million, and tax, interest expense and other income and expense of $1.2 million.

129.     During the 2017 first quarter earnings conference call held the same day, Defendant

Bhise stated:

> ***We achieved important milestones this quarter on our path to 3/30/300.***  I'm pleased to announce that the new ATT.net portal is live, the phased rollout is underway, users in more than 30 states are already benefiting from the new ATT.net experience.  We are privileged to support AT&T in driving deeper engagement with their desktop, mobile and tablet users across the United States.  The portal has been well-received by AT&T users.

130.     When asked about the AT&T revenues going forward, Bhise replied:

> So, as we've previously discussed, our expectation is still that we will ramp up revenues through the second half of this year, after the deployment is complete, getting to the full run rate for 2018, getting to it by the end of this year.  ***So, things are on track and the size is live, as you're experiencing and you just seem to like it.***

131.     On May 15, 2017, Synacor filed its quarterly report on Form 10-Q with the SEC,

announcing the Company's financial and operating results for the quarter ended March 31, 2017

(the "1Q 2017 10-Q").  For the quarter, Synacor reported a net loss of $6.66 million, or $0.21 per

diluted share, on revenue of $26.54 million, compared to a net loss of $1.57 million, or $0.05 per

diluted share, on revenue of $30.26 million for the same period in the prior year.

132.     In the 1Q 2017 10-Q, the Company stated in relevant part:

> ***We anticipate that both search and digital advertising activity and revenue will increase substantially in future quarters due to our three-year portal services contract with AT&T Services, Inc., or AT&T, to provide Managed Portals and Advertising solutions for use by AT&T's consumers.***  We entered into the portal services contract with AT&T in May 2016 and we expect to complete deploying our solutions in mid-2017.  In addition, we expect a future increase of search activity on smartphones and tablets as we believe our continuing investment in our next-generation Managed Portals and Advertising experiences will allow us to compete more effectively for search activity on smartphones and tablets.

133.     The 1Q 2017 10-Q contained certifications pursuant to Section 302 of SOX signed by the Individual Defendants.  The statements therein were the same statements as set forth in ¶ 98 herein.

134.     The statements made by Defendants in ¶¶ 128-133 were false and/or misleading and/or failed to disclose that: (a) there was no reasonable basis for Synacor to assume that revenues from the AT&T contract would approximate the claimed $100 million annual revenues generated under the previous Yahoo! contract (and, in fact, Defendants had contemporaneous knowledge that revenues would be much lower); (b) there was no reasonable basis for Synacor to assume that it would generate $300 million in annual revenue by 2019 because a critical element of Synacor's $300 million 2019 target was the $100 million in revenue from AT&T; (c) AT&T controlled monetization of the AT&T portal; (d) Defendants' statements about monetization of the portal and revenue forecasts and guidance were part of a knowing plan to inflate Synacor's share price for purposes of the Company's secondary offering; and (e) the Company's internal control over financial reporting was materially deficient, causing the Company to be incapable of producing accurate financial statements.

135.     To the extent that any of the statements in ¶¶ 128-133 were identified as forward-looking, the statement was not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.

## VI.    THE TRUTH BEGINS TO EMERGE WHILE DEFENDANTS CONTINUE TO ISSUE MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS

### A.    False and/or Misleading Statements During the Third Quarter of 2017 (July 1, 2017-September 30, 2017)

136.    On August 9, 2017, the Company held the 2017 second quarter earnings conference call where Defendant Bhise informed investors that the "joint" AT&T Synacor team had decided to prioritize engagement over monetization, stating in relevant part:

> [T]he AT&T portal product implementation, rollout and migration have been completed as planned. . . .
>
> *                *                *
>
> ***[A]t this time, the joint AT&T Synacor team has decided to prioritize engagement over monetization and so we now anticipate that much of the ramp-up in revenues that we were expecting in the second half of 2017 will get delayed to 2018.  The AT&T and Synacor joint team made this strategic decision to prioritize engagement right now over monetization. . . .***
>
> We are already generating revenue from this new consumer experience, but we expect that additional monetization tactics will be turned on at a more deliberate pace, which will result in a longer ramp to full monetization.  ***As a result, a significant portion of the revenue that we were expecting in Q3 and Q4 this year is delayed to 2018.***
>
> *                *                *
>
> So most importantly, I'd like you to take away that ***given the product success at AT&T and given our strong pipeline of revenue opportunities, we remain committed to and we anticipate delivering on our 3/30/300 plan $300 million of revenue and 30 million of adjusted EBITDA in 2019.***
>
> *                *                *
>
> We are monetizing today. . . .  [W]e're generating revenue for the portal today.  It is fully deployed. . . .  It's really a question of . . . preference. . . .  [T]he thought is that [AT&T] would like to prioritize and we would like to prioritize engagement, make sure that users are committed and interested in engaging with the site.  And in that regard, ***the team decided to take a longer term view of what was right for each of our businesses and for the end user rather than maximizing and optimizing the opportunity this month and next month and next quarter.***
>
> *                *                *

So, again, **no changes in the contract terms and let me reiterate that our partnership is very strong.** The AT&T team and the Synacor teams are working extremely well together. And so, given the nature of that relationship, given the size and strategic presence of AT&T, I'm very comfortable making sure that this is the right long-term relationship for us and then – and so in regards to your first part of the question, **as AT&T has said before, as we've said before, the site has the potential to reach $100 million of revenue. What we're talking about is kind of a ramp and choices we might make to do that.**

*        *        *

[W]e are committed to the AT&T partnership. . . .  The teams work well and closely together.  For AT&T as we do for all of our customers we aspire to be a trusted partner and when a customer of ours has a business priority we do our best with shareholder interests in mind to support them. . . .

137.    Defendant Stuart added:

**Given the focus on engagement and the delay on full monetization in the AT&T portal to 2018, we are revising our 2017 financial guidance.  For the third quarter, we expect revenue within the range of $35 million to $40 million. . . .**

**We expect revenue for the full year 2017 to be in the range of $140 million to $150 million. . . .**

138.    On August 9, 2017, post-market close, Synacor issued a press release, attached as

Exhibit 99.1 to a Form 8-K filed with the SEC, entitled "Synacor Exceeds Second-Quarter 2017

Financial Guidance; Remains on Path to '3/30/300,'" announcing its financial results for the

quarter ended June 30, 2017.  The press release stated in relevant part:

**"The joint AT&T-Synacor team has made the strategic decision to prioritize portal engagement right now over monetization**.  We are seeing the results of this focus in deeper engagement metrics.  We are already generating revenue from this new consumer experience, but **we expect that additional monetization tactics will be turned on at a more deliberate pace, which will result in a longer ramp to full monetization.  As a result, a significant portion of the revenue that we were expecting in Q3 and Q4 this year is delayed to 2018, and we are adjusting our financial guidance for 2017 accordingly**.  We believe that this engagement-focused strategy ultimately leads to a stronger, more sustainable business," concluded Bhise.

Based on information available as of August 9, 2017, the Company is providing financial guidance for the third quarter and fiscal 2017 as follows:

- **Q3 2017 Guidance**: Revenue for the third quarter of 2017 is projected to be in the range of $35.0 million to $40.0 million. The Company expects to report a net loss of $0.7 million to $3.0 million and adjusted EBITDA of $0.5 million to $2.5 million, which excludes stock-based compensation expense of $0.7 million to $0.8 million, depreciation and amortization of $2.2 million to $2.4 million and tax, interest expense and other income and expense of $0.3 million.

- **Fiscal 2017 Guidance**: *Revenue for the full year of 2017 is projected to be in the range of $140 million to $150 million, adjusted from the previous range of $160 million to $170 million.* The Company expects to report a net loss in the range of $9.3 million to $13.9 million, from the previous range of a net loss of $2.8 million to $8.0 million and adjusted EBITDA in the range of $0.0 million to $4.0 million, from the previous range of $6.0 million to $10.0 million, which excludes stock-based compensation expense of $2.7 million to $2.9 million, depreciation and amortization of $8.8 million to $9.2 million, and tax, interest expense, capitalized software impairment, and other income and expense of $1.8 million. Net income and adjusted EBITDA guidance include customer-driven product development investment in advance of revenue.

139.    On this news in ¶¶ 136-138, Synacor's share price fell $1.15, or 32.39%, to close at $2.40 on August 10, 2017. Analysts reacted to the negative news, generally lowering their price targets, but Defendants' continued false and misleading statements were believed. For example, Canaccord Genuity stated:

> Synacor's Q2 was mixed, with solid Q2 results but lower Q3 and 2017 guidance *due to a joint decision* with AT&T to delay monetization of portal users in favor of encouraging higher engagement. . . . That said, we are encouraged by comments from management around engagement levels on the portal and that it sees a robust pipeline of future potential portal deals.

140.    On August 14, 2017, Synacor filed its quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2017 (the "2Q 2017 10-Q"). For the quarter, Synacor reported a net loss of $3.28 million, or $0.09 per diluted share, on revenue of $31.22 million, compared to a net loss of $2.76 million, or $0.09 per diluted share, on revenue of $30.48 million for the same period in the prior year.

141.    In the 2Q 2017 10-Q, the Company stated in relevant part:

*We anticipate that both search and digital advertising activity and revenue will increase substantially in future quarters due to our three-year portal services contract with AT&T Services, Inc., or AT&T, to provide Managed Portals and Advertising solutions (including the AT&T Portal) for use by AT&T's consumers.* We entered into the portal services contract with AT&T in May 2016, we completed deployment of the AT&T Portal in June, 2017, and we expect to see steadily increasing search and digital advertising revenue as monetization of the AT&T Portal is optimized.  In addition, we expect a future increase of search activity on smartphones and tablets as we believe our continuing investment in our next-generation Managed Portals and Advertising solutions will allow us to compete more effectively for search activity on smartphones and tablets.

142.    The 2Q 2017 10-Q contained certifications pursuant to Section 302 of SOX signed by the Individual Defendants.  The statements therein were the same statements as set forth in ¶ 98 herein.

143.    The statements made by Defendants in ¶¶ 136-138 and ¶¶ 140-142 were false and/or misleading and/or failed to disclose: (a) that there was no reasonable basis for Synacor to assume that revenues from the AT&T contract would approximate the claimed $100 million annual revenues generated under the previous Yahoo! contract (and, in fact, Defendants had contemporaneous knowledge that revenues would be much lower); (b) that there was no reasonable basis for Synacor to assume that it would generate $300 million in annual revenue by 2019 because a critical element of Synacor's $300 million 2019 target was the $100 million in revenue from AT&T; (c) that AT&T controlled monetization of the AT&T portal, it was not "joint" control; (d) that Defendants' statements about monetization of the portal and revenue forecasts and guidance were part of a knowing plan to inflate Synacor's share price; (e) implying that AT&T stated that Synacor would earn $100 million in revenue from the portal; and (f) that the Company's internal control over financial reporting was materially deficient, causing the Company to be incapable of producing accurate financial statements.

144.    To the extent that any of the statements in ¶¶ 136-138 and ¶¶ 140-142 were identified as forward-looking, the statement was not accompanied by meaningful cautionary

statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.

### B. False and/or Misleading Statements During the Fourth Quarter of 2017 (October 1, 2017-December 31, 2017)

145.    On November 14, 2017, Synacor held an earnings conference call reporting financial results for the third quarter of 2017 where Defendant Bhise stated, "***3/30/300 still remains our goal.*** As I think about it and I guess what you're asking for is the primary variables that really determine how we get there and I think there are three of them:  one, ***AT&T still has the potential to be $100 million opportunity***."

146.    On November 14, 2017, Synacor filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2017 (the "3Q 2017 10-Q").  For the quarter, Synacor reported a net income of $0.26 million, or $0.01 per diluted share, on revenue of $36.27 million, compared to a net loss of $3.37 million, or $0.11 per diluted share, on revenue of $31.72 million for the same period in the prior year.

147.    In the 3Q 2017 10-Q, the Company stated in relevant part:

> ***We expect that both search and digital advertising activity and revenue will increase in future quarters due to our three-year portal services contract with AT&T Services, Inc., or AT&T, to provide Managed Portals and Advertising solutions (including the AT&T Portal) for use by AT&T's consumers.***  We entered into the portal services contract with AT&T in May 2016, we completed deployment of the AT&T Portal in June 2017, and we expect to see increasing search and digital advertising revenue as monetization of the AT&T Portal is optimized.  In addition, we expect a future increase of search activity on smartphones and tablets as we believe our continuing investment in our next-generation Managed Portals and Advertising solutions will allow us to compete more effectively for search activity on smartphones and tablets.

148.    The 3Q 2017 10-Q contained certifications pursuant to Section 302 of SOX signed by the Individual Defendants.  The statements therein were the same statements as set forth in ¶ 98 herein.

149.    The statements made by Defendants in ¶¶ 145-148 were false and/or misleading and/or failed to disclose that: (a) there was no reasonable basis for Synacor to assume that revenues from the AT&T contract would approximate the claimed $100 million annual revenues generated under the previous Yahoo! contract (and, in fact, Defendants had contemporaneous knowledge that revenues would be much lower); (b) there was no reasonable basis for Synacor to assume that it would generate $300 million in annual revenue by 2019 because a critical element of Synacor's $300 million 2019 target was the $100 million in revenue from AT&T; (c) AT&T controlled monetization of the AT&T portal, it was not "joint" control; (d) Defendants' statements about monetization of the portal and revenue forecasts and guidance were part of a knowing plan to inflate Synacor's share price; and (e) the Company's internal control over financial reporting was materially deficient, causing the Company to be incapable of producing accurate financial statements.

150.    To the extent that any of the statements in ¶¶ 145-148 were identified as forward-looking, the statement was not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.

## VII.    THE TRUTH IS REVEALED

151.    On March 15, 2018, post-market close, Synacor held a conference call with analysts and investors to discuss the Company's fourth-quarter earnings.  During the call, Defendant Bhise discussed the shortcomings of the AT&T contract, stating in relevant part:

> As such, my second key message is that our 2018 guidance reflects the assumption that AT&T continues to prioritize customer experience.  The ATT.net portal continues to successfully engage millions of consumers every month.  In addition, the Synacor and the AT&T team are also using our platform to launch over 35 microsites that have promoted AT&T services and driven traffic to ATT.net.

But as we have discussed on prior calls, **AT&T has chosen**, at least for the near term, to prioritize consumer experience and engagement, and we are collaboratively working with them in achieving that goal.

*Given this focus, in the last three quarters of 2017, we generated approximately $25 million in revenue from AT&T. We are expecting that AT&T will continue to focus on consumer experience, and as such, our 2018 guidance reflects the annualized 2017 run rate. Clearly, this forecast is below the $100 million annual revenue target that AT&T and Synacor announced when we first discussed the portal contract and was a critical element of Synacor's $300 million 2019 target*.

152.    The revenue from the contract, which Defendants claimed was $100 million annually, had been cut by more than half because AT&T appropriately decided to focus on marketing the portal, or bringing traffic through the portal, rather than generating revenue from it. And because the $100 million was a critical element of Synacor's $300 million revenue forecast for 2019, that forecast could also no longer be relied upon.

153.    Additionally, during the same conference call, Defendant Stuart disclosed material weaknesses in the Company's internal controls over financial reporting:

As 2017 was our fifth full year as a public company, we were required for the first time to obtain an independent audit of our internal controls over financial reporting under Section 404 of Sarbanes-Oxley as of December 31, 2017. *As a result of this audit, we will report in our Form 10-K three material weaknesses in our internal controls over financial reporting. We believe all three resulted from having initially assigned too few people with the necessary expertise to adequately document, implement and monitor controls.*

154.    On this news set forth in ¶¶ 151-153, Synacor's share price fell $0.30 per share, or 14.63%, to close at $1.75 per share on March 16, 2018.

155.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and the Class suffered significant damages.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

156.    As alleged herein, each of the Individual Defendants acted with scienter in that they knowingly or recklessly disregarded that the information disseminated to the public contained materially false and/or misleading information and omitted material information.  Throughout the Class Period, the Individual Defendants acted intentionally or in such a deliberately reckless manner as to constitute a fraud upon Plaintiffs and the Class.  Such actions caused the price of Synacor shares to be artificially inflated.

157.    In their respective roles as CEO and CFO of Synacor, the Individual Defendants were able to, and did control the information disseminated to the investing public in the Company's various SEC filings, press releases, and other public statements during the Class Period.  As a result, each had the opportunity to falsify the information provided to the public regarding Synacor's business and performance.

### A.    Synacor's Managed Portal and Advertising Segment is Its Most Important and AT&T is Its Largest Customer

158.    Synacor is an extremely small company.  During the Class Period, the Company had approximately 320 employees in the United States and 129 international employees.  Further, Synacor stated in both its 2016 and 2017 Forms 10-K that the Company "depend[ed] on the continued contributions of our senior management and other key personnel, *especially Himesh Bhise, our President and Chief Executive Officer, and William J. Stuart, our Chief Financial Officer*."  The 2016 and 2017 Forms 10-K also stated:

> The chief operating decision maker for the Company is the Chief Executive Officer. The Chief Executive Officer reviews operating results and financial information presented on a total Company basis, accompanied by information about revenue by major service line for purposes of allocating resources and evaluating financial performance.

159.    Synacor's managed portal and advertising segment provided 59% and 60% of the Company's revenue for 2016 and 2017, respectively.  As admitted by the Company in its 2017 Form 10-K, AT&T is Synacor's largest revenue producing customer "with revenue attributable to AT&T exceeding the revenue attributable to any of our other customers."

160.    The Individual Defendants repeatedly admitted having knowledge of the AT&T contract and revenue through their public statements.  For example:

- And as you can see from our guidance, we're still managing to EBITDA profitability, even though it might impact our Q4 revenues.  And I think the real prize here is ultimately launching a good product and getting to the $100 million run rate by the end of 2017, so that we can be on track to achieve our 3/30/300 plan, right?

  In terms of your specific questions about date, this is a pretty multifaceted launch.  It involves a desktop portal, it involves a mobile web portal, it involves native apps for iOS and Android, so there are several things that are going to factor into a date per se.  As I mentioned in the call, the Android app is already out, right?  I mean, we're still adding features and functionality to it every couple of weeks, but it's out.  It's gotten – hundreds of thousands of users have downloaded it, they've all given it great ratings. *Defendant Bhise, Third Quarter 2016 Earnings Call.*

- "I'd like to reiterate that our overall financial expectations for our contract with AT&T remain on track with expected revenue of $100 million per year after full deployment."  *Defendant Stuart, Fourth Quarter 2016 Earnings Call.*

- We achieved important milestones this quarter on our path to 3/30/300.  I'm pleased to announce that the new ATT.net portal is live, the phased rollout is underway, users in more than 30 states are already benefiting from the new ATT.net experience.  We are privileged to support AT&T in driving deeper engagement with their desktop, mobile and tablet users across the United States.   The portal has been well-received by AT&T users. *Defendant Bhise, First Quarter 2017 Earnings Call.*

- Given the focus on engagement and the delay on full monetization in the AT&T portal to 2018, we are revising our 2017 financial guidance.  For the quarter, we expect revenue within the range of $35 million to $40 million. . . .

We expect revenue for the full year 2017 to be in the range of $140 million to $150 million. . . .  *Defendant Stuart, Second Quarter 2017 Conference Call.*

161.    Further, according to CW2, the Individual Defendants were involved in the AT&T contract negotiations and kept abreast of the Company's progress on the project.  CW2 stated that Defendants Bhise and Stuart were hands-on leaders.

162.    By virtue of their executive positions within a Company with only 320 U.S. employees and where AT&T was its largest revenue-generating customer, it can be presumed that the Individual Defendants knew non-public material facts concerning the AT&T contract and revenues.

### B.    Synacor's Secondary Public Offering

163.    As discussed in detail above at ¶¶ 57-66, Defendants' materially false and misleading statements and omissions ensured the success of Synacor's secondary public offering. The secondary public offering provided the Company with an additional $20 million.

### C.    The Individual Defendants' Experience

164.    Scienter is further supported by the Individual Defendants' experience with internet and advertising businesses and finance.

165.    Prior to joining Synacor, Defendant Bhise served as the Vice President of New Services & Platforms of the Comcast Cable unit of Comcast Corporation where he was responsible for incubating, launching, and operating video, Internet, and advertising growth businesses.  He has also served in various executive positions at other internet and portal service companies such as Charter Communications and AOL, Inc.  Bhise received his Master's in Business Administration from the Wharton School of the University of Pennsylvania.

166.    Stuart previously served as Senior Vice President of Finance, CFO, Treasurer, and Secretary for Soapstone Networks, Inc. (formerly known as Avici Systems, Inc.), a publicly held

supplier of core routers to ISPs, from 2006 to 2011.  He also previously served as CFO for Telco

Systems (acquired by World Access, Inc.) as well as three privately-held technology companies.

Stuart received his Master's in Business Administration from Northeastern University.

## IX.    LOSS CAUSATION

167.    During the Class Period, as detailed herein, Defendants engaged in a fraudulent

scheme to deceive the market that artificially inflated the price of Synacor common stock and

operated as a fraud or deceit on Class Period purchasers of Synacor common stock.

168.    Defendants' materially false and/or misleading statements and omissions concealed

Synacor's true business prospects.  As detailed above, when the truth about the AT&T contract

and the Company's inadequate internal controls was revealed, the price of Synacor common stock

declined significantly as the prior artificial inflation was removed from the Company's stock price.

169.    As a result of their purchases of Synacor common stock during the Class Period, at

artificially inflated prices, Plaintiffs and the Class suffered damages under the federal securities

laws.

170.    The artificial inflation created by Defendants' misrepresentations and omissions

was partially removed when the Company announced on August 9, 2017, post-market close, that

the joint AT&T Synacor team was choosing to prioritize portal engagement over monetization.

*See* ¶¶ 136-139.  Following this disclosure, Synacor's share price declined by $1.15 per share, or

32.39%, on heavier than usual trading volume of 1,976,900 shares, to close on August 10, 2017 at

$2.40 per share.

171.    However, this disclosure failed to fully reveal the truth, and Defendants continued

to make materially false and/or misleading statements and omissions which induced Class

members to continue purchasing Synacor stock.

172.     After market-close on March 15, 2018, the full truth was finally revealed when Defendants were forced to admit that AT&T controlled the decision of whether to monetize the portal, and it was not a joint decision as had been previously stated.  Defendants further revealed that the Company suffered material weaknesses in its internal controls over financial reporting. *See* ¶¶ 151-154.  Following this news, Synacor's stock price dropped from a closing price of $2.05 per share on March 15, 2018, to a closing price of $1.75 per share on March 16, 2018, a 14.6% decline on unusually heavy trading volume of 691,600 shares.

173.     The timing and magnitude of the price declines in Synacor's stock on the dates of the disclosures above negate any inference that the losses suffered by Plaintiffs and the Class were caused by changed market conditions, macroeconomic or industry facts, or Company-specific facts unrelated to Defendants' fraudulent conduct.

174.     The damages suffered by Plaintiffs and the Class were the direct and proximate result of Defendants' materially false and misleading statements and omissions that artificially inflated the Company's stock price and the subsequent significant decline in the value of the Company's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct were revealed.

## X.     PLAINTIFFS' CLASS ACTION ALLEGATIONS

175.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired Synacor securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

176.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Synacor securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members of the proposed Class.  Record owners and other members of the Class can be identified from records maintained by Synacor or its transfer agent and notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

177.    Plaintiffs' claims are typical of the claims of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

178.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

179.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Synacor;

- whether the Individual Defendants caused Synacor to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Synacor securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

180.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

181.    The market for Synacor common stock was open, well-developed, and efficient at all relevant times.  As a result of Defendants' materially false and/or misleading statements and material omissions, Synacor stock traded at artificially inflated prices during the Class Period.  Plaintiffs and the Class purchased or otherwise acquired the Company's stock relying on the integrity of the market price of such securities and on publicly available market information relating to Synacor, and have been damaged thereby.

182.    During the Class Period, the artificial inflation of the value of Synacor's stock was caused by the material misrepresentations and omissions particularized in this Complaint, thereby causing the damages sustained by Plaintiffs and the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's stock to be artificially inflated at all relevant times.  When the truth was disclosed, it drove down the value of the Company's stock, causing Plaintiffs and other Class members that had purchased the stock at artificially inflated prices to be damaged as a result.

183.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Synacor securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Synacor securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

184.    Based upon the foregoing, Plaintiffs and the Class are entitled to a presumption of reliance upon the integrity of the market.

185.    Alternatively, Plaintiffs and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XII.    NO SAFE HARBOR

186.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false and/or misleading herein. The statements alleged herein all relate to then-existing facts and conditions and/or material omissions.

187.    To the extent that statements alleged to be false and/or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

## XIII.   COUNTS

### COUNT I

**Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**(Against All Defendants)**

188.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

189.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

190.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Synacor

securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Synacor securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

191.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Synacor securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Synacor's finances and business prospects.

192.    By virtue of their positions at Synacor, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

193.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As a director and senior

officers of Synacor, the Individual Defendants had knowledge of the details of Synacor's internal affairs.

194. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Synacor. As a director and senior officers of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Synacor's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Synacor securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Synacor's business and financial condition which were concealed by Defendants, Plaintiffs and the Class purchased or otherwise acquired Synacor securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

195. During the Class Period, Synacor securities were traded on an active and efficient market. Plaintiffs and the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Synacor securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Synacor securities was

substantially lower than the prices paid by Plaintiffs and the Class.  The market price of Synacor securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and the Class.

196.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

197.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating material misrepresentations to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

198.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

199.    During the Class Period, the Individual Defendants participated in the operation and management of Synacor, and conducted and participated, directly and indirectly, in the conduct of Synacor's business affairs.  Because of their senior positions, they knew the adverse non-public information about Synacor's misstatements.

200.    As a director and senior officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Synacor's financial condition and results of operations, and to correct promptly any public statements issued by Synacor which had become materially false or misleading.

201.    Because of their positions of control and authority as director and senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press

releases and public filings which Synacor disseminated in the marketplace during the Class Period concerning Synacor's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Synacor to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Synacor within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Synacor securities.

202. Each of the Individual Defendants, therefore, acted as a controlling person of Synacor. By reason of their senior management positions and/or being a director of Synacor, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Synacor to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Synacor and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

203. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Synacor.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees with interest, expert fees, and other costs; and

62

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated:  November 2, 2018                             Respectfully submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

/s/ *Lawrence P. Eagel*
Lawrence P. Eagel (LE4505)
Marion C. Passmore (*pro hac vice* forthcoming)
Melissa A. Fortunato (MF0214)
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (212) 308-5858
Email:  eagel@bespc.com
        passmore@bespc.com
        fortunato@bespc.com

*Lead Counsel for Plaintiffs and the proposed class*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of November, 2018, a true and correct copy of the foregoing SECOND AMENDED CLASS ACTION COMPLAINT was served by CM/ECF to all parties registered to the Court's CM/ECF system.

/s/ *Lawrence P. Eagel*
Lawrence P. Eagel