UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: Aug 28, 2019
```

------------------------------------------------------------ X
                                   :

    SCOTT D. LEFKOWITZ, et al.,        :

                    Plaintiffs,  :

                            :       18 Civ. 2979 (LGS)

           -against-         :

                            :     **OPINION AND ORDER**

    SYNACOR, INC., et al.,          :

                    Defendants. :

------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

      Plaintiffs, individually and on behalf of others similarly situated, bring this putative class

action against Defendants Himesh Bhise and William J. Stuart (the "Individual Defendants") and

Synacor, Inc. ("Synacor"), alleging violations of § 10(b) and § 20(a) of the Securities Exchange

Act of 1934 (the "Exchange Act").  Defendants move to dismiss the First Amended Complaint

(the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons stated

below, the motion is granted.

## I.    BACKGROUND

      The following facts are taken from the Complaint and accepted as true only for the

purpose of this motion.  *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).

### A.    Background

      Defendant Synacor is headquartered in Buffalo, New York, and publicly traded on the

NASDAQ.  Defendant Synacor provides technology development and multiplatform services to

communications providers.  Defendant Bhise has served as Synacor's Chief Executive Officer

since August 4, 2014.  Defendant Stuart was the Chief Financial Officer from September 15,

2011, to August 2018.

On May 4, 2016, Synacor announced that it had secured a three-year contract to host web and mobile ("portal") services for AT&T.  Prior to retaining Synacor, AT&T had partnered with Yahoo to provide similar services.  Analysts estimated that Yahoo's contract with AT&T generated $100 million annually for Yahoo.

**B.      Events During the Class Period**

The Complaint alleges that, from May 5, 2016, to March 15, 2018, (the "Class Period"), Defendants made material misstatements and omissions about Synacor's projected revenue from the AT&T contract; AT&T's control over generating revenue from ("monetizing") the portal; and Synacor's weaknesses in internal controls over financial reporting.

Synacor's annual revenue when it entered into the contract with AT&T was around $100 million.  After partnering with AT&T, Defendants announced their goal of achieving $100 million in revenue after full deployment of the portal in 2017 and $300 million in annual revenue by 2019.  On May 5, 2016, the day after Synacor announced its partnership and revenue projections, Synacor's stock price increased 158% to $3.64 per share.

On April 5, 2017, Synacor announced a secondary public offering of its common stock. Synacor completed the secondary offering on April 11, 2017, netting approximately $18.5 million.

On August 9, 2017, during the Q2 2017 earnings call, Bhise announced that AT&T and Synacor had decided to prioritize "engagement over monetization" and revised their 2017 financial projection from $170-$160 million to $150-$140 million.  Following this statement, Synacor's share price fell 32.39% and closed at $2.40 per share on August 10, 2017.

On a March 15, 2018, Q4 2017 earnings call, Bhise stated that AT&T had chosen to prioritize consumer experience and engagement rather than fully monetize the portal through

search and advertising.  Bhise announced that, in 2017, Synacor had generated approximately $25 million in revenue from AT&T, which was significantly "below the $100 million annual revenue target that AT&T and Synacor announced" when they first discussed their contract and which was a "critical element of Synacor's $300 million target."  During the same call, Stuart disclosed material weaknesses in Synacor's internal controls over financial reporting.

### C.      Events After the Class Period

Following the March 15, 2018, earnings call, Synacor's share price fell 14.63% and closed at $1.75 per share on March 16, 2018.  On August 30, 2018, Synacor filed a Form 8-K with the SEC stating that on August 24, 2018, AT&T had delivered a notice of non-renewal to Synacor to prevent automatic renewal of the contract.

### D.      The Alleged Material Omissions and Misrepresentations

The Complaint alleges material omissions and misstatements made during the Class Period in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  The Complaint's allegations of material omissions and misstatements fall into three categories.  The first category is statements relating to revenue projections resulting from Synacor's contract with AT&T.  The second category concerns statements and omissions about AT&T's control over monetizing the portal and the impact on Synacor's revenues.  The third category relates to Synacor's failure to disclose weaknesses in the company's internal controls for financial reporting.

#### 1.  Financial Projections

The first category of alleged misstatements concerns Synacor's financial projections relating to its contract with AT&T.  After Synacor announced its partnership with AT&T on May 4, 2016, Defendants repeatedly stated, from the signing of the contract in May through August

3

2016, that Synacor expected revenues from the AT&T contract of around $100 million per year beginning in 2017, and revenues of $300 million by 2019.  These statements were made in press releases filed with the SEC and during conference calls with investors.[1]  The Q1 2016 Form 10-Q stated that revenue from the AT&T contract "will account for a substantial portion" of 2017 revenue.  The Q2 2016 Form 10-Q stated, "We anticipate that search activity and search revenue will increase" due to the AT&T contract.

On November 14, 2016, Synacor announced during its third quarter earnings conference call that it was pushing back the official launch of the AT&T desktop and mobile web portal from Q4 2016 to the first half of 2017 and that their contract with AT&T remained "on track with expected full-year revenue of $100 million after deployment is complete."  Synacor also filed a press release with the SEC announcing the Company's financial results for the third quarter and stating that they were "on track to deliver on [the] target of $300 million in revenue and $30 million in adjusted EBITDA in 2019."  Bhise said during the conference call that he did not expect the delayed launch of the portal to impact the amount of anticipated revenues but suggested that the "$100 million run rate" might not be achieved until the end of 2017.  The Q3 2016 10-Q reiterated Bhise's statements that Synacor "anticipate[s] that activity and search revenue will increase in the future due to our three-year portal services contract with AT&T."

On March 15, 2017, in connection with Q4 and 2016 year-end financial results, Synacor filed a press release with the SEC stating "we continue to make excellent progress toward the

---

[1] The Complaint alleges that these statements were made a May 4 press release attached to a Form 8-K filed with the SEC; a May 4 article in the *Wall Street Journal* quoting Bhise; a statement by Bhise during a May 5 conference call with investors; a written presentation for the May 5 conference call; a May 10 press release attached to a Form 8-K filed with the SEC on May 11; the 2016 Q1 earnings call on May 10; a press release filed with the SEC; and a conference call on August 3 in connection with its 2016 Q2 earnings.

launch and deployment of the AT&T portal . . . . We expect accelerated revenue growth of about 30% this year, as we continue to progress on our Path to 3/30/300." On the earnings call the same day, Stuart stated that Synacor "remain[ed] on track with expected revenue of $100 million per year after full deployment." On the same call, Bhise stated, "We continue to make excellent progress with the ATT.net transition . . . . We remain on track to launch the new AT&T desktop and mobile web portal in the first half of this year and deployment will be completed through 2017." In response to a question as to how Synacor would achieve $300 million in revenue in 2019, Bhise stated, "[W]ith the 30% growth rate next year, we're looking at roughly 30% to 35% annual growth rate in the following two years to get to our $300 million target . . . starting in 2018, we'll see the full benefit of the AT&T portal revenue."

On May 10, 2017, in a press release Synacor filed with the SEC in connection with its Q1 2017 financial results, Bhise said, "We remain well positioned to deliver on our target of $300 million in revenue and $30 million in adjusted EBITDA in 2019." Bhise also repeated his estimate that annual revenue for 2017 "is projected to be in the range of $160 million to $170 million." In its Form 10Q filed with the SEC on May 15, 2017, with its Q1 2017 financial results, Synacor stated, "we anticipate that both search and digital advertising activity and revenue will increase substantially in future quarters due to our three-year portal services contract with AT&T."

On the August 9, 2017, Q2 2017 earnings call, Bhise informed investors that the joint AT&T and Syancor team had decided to prioritize user engagement over monetization, pushing the "ramp-up in revenues" from the second half of 2017 to 2018. He stated that "we remain committed to and we anticipate delivering on our 3/30/300 plan $300 million of revenue . . . in 2019" and that "the site has the potential to reach $100 million of [annual] revenue." Stuart

provided new projections of $35 to $40 million revenue for Q3 2017, and $140 to $150 revenue for the full year 2017.  The same day, Synacor filed a press release with the SEC with the same information.  In its Q2 2017 Form 10-Q, the company repeated, "We anticipate that both search and digital advertising activity and revenue will increase substantially in future quarters" due to the AT&T contract.

On November 14, 2017, during Synacor's Q3 2017 earnings call, Bhise stated, "3/30/300 still remains our goal . . . AT&T still has the potential to be $100 million opportunity."  The Q3 2017 Form 10-Q stated, "We expect that both search and digital advertising activity and revenue will increase in future quarters due to our three-year portal services contract with AT&T."

### 2.   Control Over Monetization

The second category of alleged misstatements or omissions concerns Synacor's failure to disclose AT&T's control over monetization.

On August 15, 2016, Synacor filed its Form 10-Q with the SEC for Q2 2017 and attached a redacted version of the AT&T contract, redacting almost all of the terms regarding monetization of the portal.  The Complaint alleges that the redacted portions contained material omissions that AT&T, not Synacor, controlled monetization of the portal.  The Complaint also alleges that, even if the contract provided for joint control, "AT&T effectively controlled monetization . . . . because of its dominating power as a telecommunications giant" and that one unredacted portion of the contract provides that AT&T "controlled marketing . . . to drive user engagement and traffic."

The Complaint alleges that Synacor portrayed the delayed monetization of the portal as a joint decision between Synacor and AT&T, when in reality, the companies "had conflicting priorities and AT&T was calling the shots."  During the 2Q 2017 second quarter earnings call on

August 9, 2017, Bhise informed investors that "the joint AT&T Synacor team has decided to prioritize engagement over monetization," but on March 15, 2018, Bhise stated, "AT&T has chosen, at least for the near term, to prioritize consumer experience and engagement, and we are collaboratively working with them in achieving this goal."

### 3.   Weaknesses in Internal Controls

The third category of misstatements or omissions concerns Synacor's control weaknesses over financial reporting.  The Complaint alleges that the Individual Defendants were aware of material weaknesses "that should have given Bhise and Stuart pause" when they signed the certifications that accompanied each of the Forms 10-Q and 10-K that Synacor filed during the class period.  These certifications are required by Sarbanes-Oxley Act ("SOX") Section 302 and state:

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting . . . (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

The Complaint alleges that the Individual Defendants failed to disclose that "the company's internal control over financial reporting was materially deficient, causing the company to be incapable of producing accurate financial statements."  On the March 15, 2018, earnings call, Stuart disclosed "three material weaknesses" in Synacor's internal controls over financial reporting.  On March 16, 2018, Deloitte & Touche issued an adverse auditors' opinion, stating that Synacor had not maintained effective internal control over financial reporting as of December 31, 2017.

### E.    Scienter

The Complaint alleges scienter based on inferences from the facts summarized above.  In addition, the Complaint relies on confidential witnesses ("CW").

## II.    STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556).  It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[]" claims "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570.  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly,* 550 U.S. at 555).  On a Rule 12(b)(6) motion, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59 (2d Cir. 2016) (quoting *Littlejohn v. City of N.Y.,* 795 F.3d 297, 306 (2d Cir. 2015)).  "In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *ASARCO L.L.C. v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (quoting *In re Thelen L.L.P.,* 736 F.3d 213, 219 (2d Cir. 2013)).

Plaintiffs assert claims under § 10(b) of the Exchange Act and its implementing rule, Rule 10b-5.  That rule makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.  To allege a violation of § 10(b) and Rule 10b-5, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  "[T]he plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id*. § 78u(b)(2)(A).

The six elements of a claim under § 10(b) and Rule 10b-5 are: "(1) a material misrepresentation or omission by the defendant; (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 804 (2011); *accord Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016).

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the [Private Securities Litigation Reform Act ("PSLRA")] and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud."  *Emps. Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009)).  "A securities

fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99.  Allegations of fraud may be "too speculative even on a motion to dismiss," particularly when premised on "'distorted inferences and speculations.'"  *Id.* at 104 (citing and quoting *Segal v. Gordon*, 467 F.2d 602, 606, 608 (2d Cir. 1972)).

"The PSLRA expanded on the Rule 9(b) pleading standard, requiring that securities fraud complaints specify each misleading statement; that they set forth the facts on which [a] belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks omitted) (alteration in original).

The Complaint also asserts a claim under § 20(a) of the Exchange Act.  To state a claim under § 20(a), the complaint must sufficiently plead "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays P.L.C.*, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks omitted).  If the Complaint does not allege a primary violation, then the § 20(a) claim must be dismissed.

## III.   DISCUSSION

The Complaint alleges that Defendants' misleading statements allowed Synacor to inflate its share price for the company's secondary offering.  The Complaint alleges that Synacor misled investors about (1) the amount of projected revenue Synacor could reasonably expect from its

contract with AT&T, (2) the extent of AT&T's control over monetizing the portal and (3) weaknesses in Synacor's internal controls over financial reporting.  The Complaint fails to state a claim as to any of these statements and omissions.  Principally at issue on this motion is whether the Complaint sufficiently pleads two of the six elements of securities fraud -- a material misrepresentation or omission, and scienter.

### A.   Section 10(b) Violation

#### 1.   Material Omissions and Misrepresentations

As noted above, the first element of a Rule 10b-5 violation is that the defendant made an omission or misstatement of material fact.  "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information.  Disclosure is required under these provisions only when necessary to make . . .  statements made, in the light of the circumstances under which they were made, not misleading."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (internal quotation marks omitted) (quoting Rule 10b-5, 17 C.F.R. § 240.10b-5(b)); *accord In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) ("Vivendi"). "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth, even where there is no existing independent duty to disclose information on the issue or topic."  *Vivendi*, 838 F.3d at 258 (internal quotation marks omitted).

A statement or omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" to the market.  *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015) (internal quotation marks and citations omitted).  "To be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an

investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014).

### a.  Financial Projections

The Complaint does not adequately plead that Defendants' financial projections were materially misleading.  The statements are either non-actionable opinion statements or forward-looking statements.

### i.  Opinion Statements

Statements of opinion may be actionable misstatements if (1) "the speaker did not hold the belief she professed," (2) "if the supporting fact[s] she supplied were untrue," *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,* 135 S. Ct. 1318, 1327 (2015), or (3) the stated opinion, "though sincerely held and otherwise true as a matter of fact, . . . omit[ted] information whose omission ma[de] the [stated opinion] misleading to a reasonable investor," *Tongue v. Sanofi,* 816 F.3d 199, 210 (2d Cir. 2016); *accord In re Ferrellgas Partners, L.P., Sec. Litig.,* No. 16 Civ. 7840, 2018 WL 2081859, at *9 (S.D.N.Y. Mar. 30, 2018).

A plaintiff who alleges falsity based on the third ground "'must identify particular (and material) facts going to the basis for the issuer's opinion -- facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have -- whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'"  *Tongue*, 816 F.3d at 209 (quoting *Omnicare,* 135 S. Ct. at 1332).  "[M]eeting the standard under *Omnicare* 'is no small task for an investor.'"  *Id.* (quoting *Omnicare,* 135 S. Ct. at 1332).  Reasonable investors are aware that "opinions sometimes rest on a weighing of competing facts," and they "do[ ] not expect that *every* fact known to an issuer supports its

opinion statement." *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329.)  Instead, investors "read[ ] each statement. . . in light of all [the] surrounding text, including hedges, disclaimers, and apparently conflicting information," and "take[ ] into account the customs and practices of the relevant industry." *Id.* (quoting *Omnicare*, 135 S. Ct. at 1330).  In general, overly optimistic statements about corporate performance do not give rise to securities violations.  *IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund,* 783 F.3d at 392.  "[T]o be actionable, the representation must be one of existing fact, and not merely an expression of opinion, expectation or declaration of intention."  *In re Duane Reade Inc. Sec. Litig.,* No. 02 Civ. 6478, 2003 WL 22801416, at *4 (S.D.N.Y. Nov. 25, 2003) (quoting *Greenburg v. Churst,* 282 F. Supp. 2d 112, 121 (S.D.N.Y. 2003)), *aff'd sub nom. Nadoff v. Duane Reade, Inc.,* 107 Fed. App'x 250 (2d Cir. 2004).

Defendants' following statements about future revenue growth and belief that the Company was "on track" to achieve its projected revenue goals are statements of opinion:

- "We anticipate that search activity and search revenue will increase in the future due to our three-year portal services contract with AT&T."

- "[W]e continue to make excellent progress toward the launch and deployment of the AT&T portal . . . . We expect accelerated revenue growth of about 30% this year, as we continue to progress on our Path to 3/30/300."

- "[W]e achieved important milestones this quarter on our path to 3/30/300," referencing the new ATT.net live portal.

- "[T]he site has the potential to reach $100 million of revenue."

- And "3/30/300 still remains our goal . . . AT&T still has the potential to be $100 million opportunity."

*See Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 58 (2d Cir. 1996) (Statements "regarding future earnings, sales goals and [] desire to achieve continued prosperity were just the sort of predictive statements of opinion and belief that courts have found immaterial."); *accord In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018)

("Statements that express expectations about the future rather than presently existing, objective facts are [] statements of opinion.") (internal quotation marks omitted); *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 227 (S.D.N.Y. 2018) (finding that the statements "we still expect . . . high single-digit growth;" "[we are] on the right track;" and "operationally . . . things are moving along exactly in line with what we thought" are opinion statements related to future earnings).

The Complaint does not allege any of the three types of facts necessary to make the statements of opinion actionable. First, the Complaint alleges in only a conclusory fashion that the Individual Defendants did not believe their own statements about Synacor's future revenues from the AT&T contract: "By virtue of their positions at Synacor, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions . . . ." Without any facts to make this conclusion plausible, the allegation that Defendants did not actually believe their financial projections is insufficient.

Second, the Complaint does not challenge the "supporting facts" Defendants supplied in support of the projections. To the contrary, the Complaint appears to embrace, but distinguish, the fact that Yahoo reportedly earned $100 million per year from the AT&T contract, giving rise to the inference that Synacor could do the same. The Complaint alleges that Defendants disclosed that Synacor's revenue projections were based on the value of AT&T's prior contract with Yahoo, and that financial analysts agreed that the "AT&T partnership generated about $100 million in annual revenue for Yahoo." The Complaint quotes a *Wall Street Journal* report that "AT&T is unwinding a 15-year partnership with Yahoo . . . . The deal effectively moves a major chunk of AT&T's business away from Yahoo [to Synacor]."

14

Third, the Complaint could be construed to allege that Defendants may have sincerely believed their projections but omitted particular identified facts that were the basis for the projections "whose omission makes [the projections] misleading to a reasonable person reading the statement fairly and in context."  The Complaint alleges that "the Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made . . ." But the allegations about the omitted facts are insufficient.

For example, the Complaint alleges that there was "no reasonable basis to assume" that the Synacor contract would generate the same revenue as the Yahoo contract because the Synacor contract was "a materially different contract [from AT&T's contract with Yahoo]" and Synacor's portal "had no track record of performance or customer receptivity" and any new portal would result in "less customer traffic."  The Complaint also cites two CWs -- the Director of Product at Synacor from May 2016 to September 2016 and Vice President of Product & Design from April 2014 to 2018 -- stating that Synacor knew it would lose some users in the transition from Yahoo to Synacor because Synacor was making "fundamental changes to the platform" and "because with any new product launch, you lose a percentage of users."  But these risks were not hidden, as Defendants made no secret of the fact that Synacor had entered into its own contract with AT&T and that it anticipated similar revenues to Yahoo's only after "we fully deploy our products and migrate AT&T customers."

The Complaint also alleges that Defendants failed to disclose that AT&T controlled monetization of the AT&T portal.  The Complaint alleges that, although Synacor attached the AT&T contract to its Q2 2017 Form 10-Q, the attachment omitted all of the material terms regarding monetization of the portal.  But the Complaint itself alleges facts showing that the

public was aware of AT&T's control over the portal: "AT&T effectively controlled monetization of the portal because of its dominating power as a telecommunications giant.  In fact, according to one of the few readable portions of the contract, AT&T controlled marketing and would be the one to develop the annual marketing plan to drive user engagement and traffic, with input from Synacor."  *See Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 337–38 (2d Cir. 2011) (the plaintiffs' complaint failed to state a claim when an "SEC-mandated statement explicitly disclosed the very liquidity risks about which [plaintiffs] claim to have been misled").  Even if AT&T exercised control over monetization, and even if that fact were hidden, the Complaint does not plausibly explain how omission of this fact "makes the opinion statement at issue [i.e., the revenue projections] misleading to a reasonable person reading the statement fairly and in context."  *Tongue*, 816 F.3d at 209.[2]

The Complaint also alleges that Defendants failed to disclose weaknesses in internal controls for financial reporting.  The Complaint, however, identifies no connection between weak internal controls and the revenue projections.  The control weaknesses identified by Defendants' auditor related to the preparation of historical financial statements, not forecasts related to the AT&T contract.  The Complaint makes clear that Defendants based their revenue

---

[2] This analysis also applies to the allegation that Defendants violated Item 303 of Regulation S-K by not disclosing that AT&T controlled monetization of the portal and was focusing on user engagement.  Item 303 requires a registrant to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii); *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017).  Omission of this information is actionable under Section 10(b) only if all the "requirements to sustain an action under Sectioin 10(b) are fulfilled."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015).

projections on AT&T's prior contract with Yahoo and is silent as to how deficient internal controls influenced revenue projections.

### ii.  Forward Looking Statements

Synacor's revenue projections are not actionable for the additional reason that they fall within the scope of the PSLRA's safe harbor for forward-looking statements.  *See* 15 U.S.C. § 78u-5(c).

The PSLRA provides that "a statement containing a projection of . . .  income (including income loss), earnings (including earnings loss) per share, . . .  or other financial items" and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management," are forward-looking statements.  15 U.S.C. § 78u-5(i)(1)(A) & (C); *see also In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *12.

Defendants' statements that they expected the AT&T contract to "bring in an additional $100 million a year [after full deployment]," expected the company to "generate $30 million of EBITDA" and achieve their "new long-term financial target of $300 million in revenue," "anticipate[d] that search activity and search revenue will increase," were "on track to deliver on [the] target of $300 million in revenue," "expect[ed] accelerated revenue growth of about 30%" and "remain[ed] on track with expected revenue of $100 million per year after full deployment," and "remain[ed] well positioned to deliver on our target of $300 million in revenue and $30 million in adjusted EBITDA in 2019" are all forward looking statements as defined under the PSLRA.  *See In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *12 (the statement "'we remain on track to deliver adjusted EBITDA in line with expectations' fall[s] within the PSLRA safe harbor for forward-looking statements."); *In re Austl. & N.Z. Banking*

*Grp. Ltd. Sec. Litig.*, No. 08 Civ. 11278, 2009 WL 4823923, at *13 (S.D.N.Y. Dec. 14, 2009)

("[A] good-faith statement that [a company] was 'on track' to achieve some goal does not serve

as a guarantee that the goal will indeed be achieved")).  The words "anticipate" and "expect" are

common markers of forward looking statements.  *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 769

(2d Cir. 2010).[3]

"[A] defendant is not liable if (1) the forward-looking statement is identified and

accompanied by meaningful cautionary language, (2) the forward-looking statement is

immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with

actual knowledge that it was false or misleading.  Because the safe harbor is written in the

disjunctive, a forward-looking statement is protected under the safe harbor if any of the three

prongs applies."  *Vivendi,* 838 F.3d at 245–46 (internal quotation marks, modifications and

citation omitted).

Here, the safe harbor applies via the third prong.  As discussed above, the Complaint does

not adequately plead that Defendants had actual knowledge that the financial projections were

false or misleading.  *See id.* at 247.  Plaintiffs argue that Defendants must have known the

revenue projections were false and misleading because, by mid-2017, Defendants knew that

AT&T wanted to "prioritize engagement over monetization."  The Complaint, however, alleges

---

[3] Plaintiffs argue that the PSLRA's safe harbor protections do not apply because the statements
encompass a representation of present fact and cite the following statements: "Our continued
trajectory toward $300 million in revenue in three years is reflected in the demonstrated progress
we are making against our 2016 strategic objectives"; "we are advancing in-line with our plans . .
. with expected revenue of $100 million"; "we remain well positioned . . . and are on track to
deliver on our target of $300 million."  This argument is misplaced because the cases cited in the
text above hold that nearly analogous language is forward-looking.  To the extent these
allegations contain a representation of present fact, the Complaint does allege that those facts are
false -- that Defendants were not making progress toward their 2016 strategic objections, or that
they were not advancing in line with their plans.

no facts that suggest that prioritizing user engagement over monetization meant that Defendants knew that that the projected revenues would never be realized, rather than delayed. The Complaint quotes a statement from the Q2 2017 earnings call in August 2017, that "at this time, the joint AT&T Synacor team has decided to prioritize engagement over monetization and we now anticipate that much of the ramp up in revenue that we were expecting in the second half of 2017 would get delayed to 2018." Similarly, the allegations that the CWs viewed the projections as unrealistic are not tantamount to Defendants' knowledge that the projections were false. To the contrary, CW2 allegedly stated that he "heard some pushback on [Bhise], but he always said it could do better [than the modest projections.]"

### b.  Weaknesses in Internal Controls

The Complaint alleges that the Defendants' certifications pursuant to SOX Section 302 contained actionable false and misleading statements about Synacor's internal controls. Defendants' SOX certifications stated, in part that, to the knowledge of the certifying party, Synacor's financial statements were accurate, and that Synacor had disclosed all significant deficiencies in internal controls over financial reporting, and any fraud in connection with financial reporting. These statements were false in light of the auditors' March 16, 2018, adverse opinion on the Company's internal control over financial reporting. However, any claim of fraud based on these statements fails because the Complaint does not plausibly plead scienter.

The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). This "state of mind" requires a showing "of intent to deceive, manipulate, or defraud, or recklessness." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (internal quotation marks and citations omitted);

*accord Schwab v. E\*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 755–56 (S.D.N.Y.), *aff'd*, 752 F.

App'x 56 (2d Cir. 2018).  "The scienter requirement is met where the complaint alleges facts

showing either: (1) a motive and opportunity to commit the fraud; or (2) strong circumstantial

evidence of conscious misbehavior or recklessness." *Blanford*, 794 F.3d at 306 (citing *ATSI*

*Commc'ns, Inc.*, 493 F.3d at 99).  Taking into account "plausible opposing inferences," the

inference of scienter must be "cogent and at least as compelling as any opposing inference one

could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

323-24 (2007).

The Complaint does not sufficiently raise an inference of scienter with respect to

Defendants' SOX certifications.  The auditors identified three material weaknesses: (1)

ineffective control environment due to a lack of sufficient qualified personnel with an

appropriate level of knowledge and experience; (2) ineffective control activities due to the lack

of timeliness in executing business process controls; and (3) ineffective monitoring controls to

ascertain whether the components of internal control were present and functioning.  The

Complaint alleges that Bhise cut "fifty jobs . . . to trim costs" and that CW3, the Accounts

Payable Coordinator in the Finance Department from April 2014 to June 2017, stated that

"turnover was terrible" and "financial oversight was poor."  The allegations that Defendants

were aware that the Company was understaffed and lacked personnel in internal controls does

not raise an actionable inference that Defendants knew that the SOX certifications were false; an

equally plausible inference is that Defendants believed that any deficiencies were not so acute as

to rise to the level of an internal control weakness. *See Tellabs, Inc.*, 551 U.S. at 323-24;  *In re*

*Veon Ltd. Sec. Litig.*, No. 15 Civ. 08672, 2018 WL 4168958, at \*14 (S.D.N.Y. Aug. 30, 2018)

("Since the statements are predicated on the certifying officer's belief, and [p]laintiffs do not

sufficiently allege that [defendant] believed the statements were false or misleading, the SOX certification here is not actionable."); *see also Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) ("[P]laintiff cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements."). Accordingly, the Complaint fails to plead a claim as to the statements related to weaknesses in internal controls.

### B. Section 20(a) Violation

As the Court has granted Defendants' Motion to Dismiss Plaintiffs' § 10(b) claim, Defendants' motion to dismiss the Section 20(a) claim is granted.

### C. Leave to Replead

Plaintiffs request leave to replead any dismissed claims. Leave to amend should be freely given when justice so requires. Fed. R. Civ. P. 15(a). "However, where the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999); *accord Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300, 2017 WL 1133446, at *7 (S.D.N.Y. Mar. 24, 2017). Leave to amend the Complaint also may be denied where the plaintiff "fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies. . . ." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014). The Court does not believe that the deficiencies identified above can be cured. Nevertheless, any application for leave to replead shall be made as provided below.

**IV.      CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.

Should Plaintiffs seek leave to replead, they shall file within 21 days of this Order a red-lined version of a proposed amended complaint, showing changes from the current Complaint, together with a letter application, not to exceed three pages, explaining how the legal deficiencies identified in this Opinion have been cured.  No pre-motion conference nor any response is necessary unless requested by the Court.

The Clerk of Court is respectfully directed to close the motion at Docket No. 50.

Dated:  August 28, 2019
         New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE